(CONSTITUTIONAL LAW.)

MARTIN, *Heir at law and devisee of* FAIRFAX, *v.* HUNTER'S *Lessee.*

The appellate jurisdiction of the supreme court of the United States extends to a final judgment or decree in any suit in the highest court of law or equity of a state; where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the Uni-

ted States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any state, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favour of such their validity; or the construction of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed, by either party, under such clause of the constitution, treaty, statute or commission.

Such judgment or decree may be reexamined by writ of error in the same manner as if rendered in a circuit court.

If the cause has been once remanded before, and the state court decline or refuse to carry into effect the mandate of the supreme court thereon, this court will proceed to a final decision of the same, and award execution thereon.

If the validity or construction of a treaty of the United States is drawn in question, and the decision is against its validity, or the title specially set up by either party, under the treaty, this court has jurisdiction to ascertain that title and determine its legal validity, and is not confined to the abstract construction of the treaty itself.

The return of a copy of the record, under the seal of the court, certified by the clerk, and annexed to the writ of error, is a sufficient return in such a case.

It need not appear that the judge who granted the writ of error did, upon issuing the citation, take a bond, as required by the 22d section of the judiciary act. That provision is merely directory to the judge, and the presumption of law is, until the contrary appears, that every judge who signs a citation has obeyed the injunctions of the act.

THIS was a writ of error to the court of appeals of the state of Virginia, founded upon the refusal of that court to obey the mandate of this court, requiring the judgment rendered in this same cause, at February term, 1813, to be carried into due execution. The following is the judgment of the court of appeals, rendered on the mandate: " The court is unanimously of opinion that the appellate power of the supreme court of the United States does not

1816.

Martin
v.
Hunter's
Lessee.

extend to this court under a sound construction of the constitution of the United States; that so much of the 25th section of the act of congress, to establish the judicial courts of the United States, as extends the appellate jurisdiction of the supreme court to this court, is not in pursuance of the constitution of the United States. That the writ of error in this cause was improvidently allowed under the authority of that act; that the proceedings thereon in the supreme court were *coram non judice* in relation to this court, and that obedience to its mandate be declined by the court."

The original suit was an action of ejectment, brought by the defendant in error, in one of the district courts of Virginia, holden at Winchester, for the recovery of a parcel of land, situate within that tract, called the northern neck of Virginia, and part and parcel thereof. A declaration in ejectment was served (April, 1791) on the tenants in possession; whereupon Denny Fairfax, (late Denny Martin,) a British subject, holding the land in question, under the devise of the late Thomas Lord Fairfax, was admitted to defend the suit, and plead the general issue, upon the usual terms of confessing lease, entry, and ouster, &c., and agreeing to insist, at the trial, on the title only, &c. The facts being settled in the form of a case agreed to be taken and considered as a special verdict, the court, on consideration thereof, gave judgment (24th of April, 1794) in favour of the defendant in ejectment. From that judgment the plaintiff in ejectment (now defendant in error) appealed to the court of appeals,

being the highest court of law of Virginia. At April term, 1810, the court of appeals reversed the judgment of the district court, and gave judgment for the then appellant, now defendant in error, and thereupon the case was removed into this court.

State of the facts as settled by the case agreed.

1st. The title of the late Lord Fairfax to all that entire territory and tract of land, called the Northern Neck of Virginia, the nature of his estate in the same, as he inherited it, and the purport of the several charters and grants from the kings Charles II. and James II., under which his ancestor held, are agreed to be truly recited in an act of the assembly of Virginia, passed in the year 1736, [Vide *Rev. Code*, v. 1. ch. 3. p. 5.] " For the confirming and better securing the titles to lands in the Northern Neck, held under the Rt. Hon. Thomas Lord Fairfax," &c.

From the recitals of the act, it appears that the first letters patent (1 Car. II.) granting the land in question to Ralph Lord Hopton and others, being surrendered, in order to have the grant renewed, with alterations, the Earl of St. Albans and others (partly survivors of, and partly purchasers under, the first patentees) obtained new letters patent (2 Car. II.) for the same land and appurtenances, and by the same description, but with additional privileges and reservations, &c.

The estate granted is described to be, " *All that entire tract, territory, or parcel of land, situate, &c., and bounded by, and within the heads of, the rivers Tappahannock, &c., together with the rivers themselves, and all the islands, &c., and all woods, underwoods, timber, &c.*

*mines of gold and silver, lead, tin, &c., and quarries of stone and coal, &c., to have, hold, and enjoy the said tract of land, &c. to the said [patentees,] their heirs and assigns for ever, to their only use and behoof, and to no other use, intent, or purpose whatsoever."*

There is reserved to the crown the annual rent of 6l. 13s. 4d. " in lieu of all services and demands whatsoever;" also one-fifth part of all gold, and one-tenth part of all silver mines.

To the absolute title and seisin in fee of the land and its appurtenance, and the beneficial use and enjoyment of the same, assured to the patentees, as tenants *in capite,* by the most direct and abundant terms of conveyancing, there are superadded certain collateral powers of baronial dominion ; reserving, however, to the governor, council and assembly of Virginia, the exclusive authority in all the military concerns of the granted territory, and the power to impose taxes on the persons and property of its inhabitants for the public and common defence of the colony, as well as a general jurisdiction over the patentees, their heirs and assigns, and all other inhabitants of the said territory,

In the enumeration of privileges specifically granted to the patentees, their heirs and assigns, is that *" freely and without molestation of the king, to give, grant, or by any ways or means, sell or alien all and singular the granted premises, and every part and parcel thereof, to any person or persons being willing to contract for, or buy, the same."*

There is also a condition to avoid the grant, as to so much of the granted premises as should not be

possessed, inhabited, or planted, by the means or procurement of the patentees, their heirs or assigns, in the space of 21 years.

The third and last of the letters patent referred to, (4 Jac. II.,) after reciting a sale and conveyance of the granted premises by the former patentees, to Thomas Lord Culpepper, " *who was thereby become sole owner and proprietor thereof, in fee simple,*" proceeds to confirm the same to Lord Culpepper, in fee simple, and to release him from the said condition, for having the lands inhabited or planted as aforesaid.

The said act of assembly then recites, that Thomas Lord Fairfax, heir at law of Lord Culpepper, had become " *sole proprietor of the said territory, with the appurtenances, and the above-recited letters patent.*"

By another act of assembly, passed in the year 1748, (*Rev. Code,* v. 1. ch. 4. p. 10.,) certain grants from the crown, made while the exact boundaries of the Northern Neck were doubtful, for lands which proved to be within those boundaries, as then recently settled and determined, were, with the *express consent* of Lord Fairfax, confirmed to the grantees; to be held, nevertheless, of him, and all the rents, services, profits, and emoluments, (reserved by such grants,) to be paid and performed to him.

In another act of assembly, passed May, 1779, for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated lands, there is the following clause, viz. (vide *Chy. Rev.* of 1783, ch. 13. s. 6. p. 98.) " And that the

proprietors of land within this commonwealth may no longer be subject to any servile, feudal, or precarious tenure, and to prevent the danger to a free state from perpetual revenue, be it enacted, that the royal mines, quit-rents, and all other reservations and conditions in the patents or grants of land from the crown of England, under the former government, shall be, and are hereby declared null and void; and that all lands thereby respectively granted shall be held in absolute and unconditional property, to all intents and purposes whatsoever, in the same manner with the lands hereafter granted by the commonwealth, by virtue of this act."

2d. As respects the actual exercise of his proprietary rights by Lord Fairfax.

It is agreed that he did, in the year 1748, open and conduct, at his own expense, an office within the Northern Neck, for granting and conveying what he described and called, the *waste* and *ungranted lands* therein, upon certain terms, and according to certain rules by him established and published; that he did, from time to time, grant parcels of such lands in fee; (the deeds being registered at his said office, in books kept for that purpose, by his own clerks and agents;) that, according to the uniform tenor of such grants, he did, styling himself *proprietor* of the Northern Neck, &c., in consideration of a certain composition to him paid, and of certain annual rents therein reserved, grant, &c.; with a clause of re-entry for non-payment of the rent, &c.; that he also demised, for lives and terms of years, parcels of the same description of lands, also reserving an-

nual rents; that he kept his said office open for the purposes aforesaid, from the year 1748 till his death, in December, 1781; during the whole of which period, and before, he exercised the right of granting in fee, and demising for lives and terms of years, as aforesaid, and received and enjoyed the rents annually, as they accrued, as well under the grants in fee, as under the leases for lives and years. It is also agreed that Lord Fairfax died seised of lands in the Northern Neck, equal to about 300,000 acres, which had been granted by him in fee, to one T. B. Martin, upon the same terms and conditions, and in the same form, as the other grants in fee before described; which lands were, soon after being so granted, reconveyed to Lord Fairfax in fee.

3d. Lord Fairfax, being a citizen and inhabitant of Virginia, died in the month of December, 1781, and, by his last will and testament, duly made and published, devised the whole of his lands, &c., called, or known by the name of the Northern Neck of Virginia, in fee, to Denny Fairfax, (the original defendant in ejectment,) by the name and description of the Reverend Denny Martin, &c., upon condition of his taking the name and arms of Fairfax, &c.; and it is admitted that he fully complied with the conditions of the devise.

4th. It is agreed that Denny Fairfax, the devisee, was a native-born British subject, and never became a citizen of the United States, nor any one of them, but always resided in England, as well during the revolutionary war as from his birth, about the year 1750, to his death, which happened some time be-

tween the years 1796 and 1803, as appears from the record of the proceedings in the court of appeals.

It is also admitted that Lord Fairfax left, at his death, a nephew named Thomas Bryan Martin, who was always a citizen of Virginia, being the younger brother of the said devisee, and the second son of a sister of the said Lord Fairfax; which sister was still living, and had always been a British subject.

5th. The land demanded by this ejectment being agreed to be part and parcel of the said territory and tract of land, called the Northern Neck, and to be a part of that description of lands, within the Northern Neck, called and described by Lord Fairfax as "*waste and ungranted*," and being also agreed never to have been escheated and seised into the hands of the commonwealth of Virginia, pursuant to certain acts of assembly concerning escheators, and never to have been the subject of any inquest of office, was contained and included in a certain patent, bearing date the 30th of April, 1789, under the hand of the then governor, and the seal of the commonwealth of Virginia, purporting that the land in question is granted by the said commonwealth unto David Hunter (the lessor of the plaintiff in ejectment) and his heirs forever, by virtue and in consideration of a land office treasury warrant, issued the 23d of January, 1788. The said lessor of the plaintiff in ejectment is, and always has been, a citizen of Virginia; and in pursuance of his said patent, entered into the land in question, and was thereof possessed, prior to the institution of the said action of ejectment.

6th. The definitive treaty of peace concluded in the year 1783, and the treaty of amity, commerce, and navigation, of 1794, between the United States of America and Great Britain, and also the several acts of the assembly of Virginia, concerning the premises, are referred to, as making a part of the case agreed.

Upon this state of facts, the judgment of the court of appeals of Virginia was reversed by this court, at February term, 1813, and thereupon the mandate above mentioned was issued to the court of appeals, which being disobeyed, the cause was again brought before this court.

*Jones*, for the plaintiffs in error. There are two questions in the cause, 1st. Whether this court has jurisdiction? 2d. Whether it has been rightly exercised in the present case?—1. Cotemporaneous construction, and the uniform practice since the constitution was adopted, confirms the jurisdiction of the court. The authority of all the popular writers who were friendly to it, is to the same effect; and the letters of *Publius* show that it was agreed, both by its friends and foes, that the judiciary power extends to this class of cases. In the conventions, by which the constitution was adopted, it was never denied by its *friends* that its powers extended as far as its *enemies* alleged. It was admitted, and justified as expedient and necessary. Ascending from these popular and parliamentary authorities, to the more judicial evidence of what is the supreme law of the land, we find a concurrence of opinion. This government

is not a mere confederacy, like the Grecian leagues,
or the Germanic constitution, or the old continental
confederation. In its legislative, executive, and ju-
dicial authorities, it is a national government, to
every purpose, within the scope of the objects enu-
merated in the constitution. Its judicial authority is
analagous to its legislative : it alone has the power
of making treaties ; those treaties are, declared to
be the law of the land ; and the judiciary of the Uni-
ted States is exclusively vested with the power of
construing them. The second section, article third,
of the constitution provides, that the judicial power
" shall extend to all cases in law or equity, arising
under this constitution, the laws of the United States,
and the treaties made, or which shall be made, under
their authority," &c. The word *shall*, is a sign of
the future tense, and implies an imperative mandate,
obligatory upon those to whom it is addressed. The
verb *extend*, is said to mean nothing more than *may
extend* ; but the neuter verb, and not the verb active,
is used, and imports that the power *shall* extend—it
shall *reach to*, or over. " All cases," is an emphatic
expression, and shows that it cannot extend to a li-
mited number of cases. The state legislatures can-
not make treaties. Why should the state judicatures
be offended at being excluded from the authority of
expounding them ? 2. Has congress exercised the
power vested in it according to the constitution ? If
the jurisdiction be exclusive and paramount, it must
be exercised according to the discretion of congress,
the constitution having prescribed no specific mode ;
it must operate upon the people of the United States

in their personal and aggregate capacities, upon them and all their magistrates and tribunals. Congress *must* establish a supreme court. They *may* establish inferior courts. The supreme court must have the appellate jurisdiction vested in them by the constitution, and congress cannot denude them of it, by failing to establish *inferior* tribunals. Those tribunals may not exist; and, therefore, the appellate jurisdiction must extend beyond appeals from the courts of the United States only. The state courts are to adjudicate under the supreme law of the land, as a rule binding upon them. They do not act upon it as judges determining by a foreign law, in a case of *lex loci*, for example; they act upon it as a municipal law of the state where they sit, but derived from the government of the United States. 3. As to the remedy of the plaintiffs in error. This court is not limited to a mandate as the only remedy. The judiciary act provides, (section 24.,) that when a cause has been once remanded, this court may award a writ of execution upon its own judgment. The cause is now before the court, so as to enable it to do this; the record is well certified, according to the law and practice of Virginia, and of every other state, under the seal of the court and signature of the clerk. Even supposing it necessary to take a retrospective view, and look at the former record, it originated, and still remains, in this forum, and it is unnecessary to send to the court of appeals for it.

*Tucker*, contra. 1. At common law the writ of error must be returned by the court itself. It is im-

perfect in this case, and, therefore we have a right to a *certiorari*, or writ of diminution. But there is no error; the court of appeals have done nothing; and, therefore, there is no error in their proceedings. It is a mere omission to do what they ought to have done, and no judgment can be rendered here to reverse what they have not done. This court cannot award execution upon the judgment in the original cause. That judgment is final; it is *functus officio*, and nothing more can be done with it. The original cause is not brought here again completely, and, therefore, the provision in the 24th section of the judiciary act does not apply. 2. Is the judiciary act constitutional? This court, undoubtedly, has all the incidental powers necessary to carry into effect the powers expressly given by the constitution. But this cannot extend to the exercise of any power inconsistent with the whole genius, spirit, and tenor of the constitution. Neither the practice and acquiescence under it, nor cotemporaneous expositions can apply, because they are contradictory. State courts have refused to execute the penal laws of the United States, and the court of appeals ground themselves on the resolutions of the Virginia legislature in 1798; but this court will disregard these controversial political party works. The chief defect of the former confederation was, that it acted on political, and not on natural, persons. The whole scheme of the constitution aims at acting on the citizens of the United States at large, and not on the state authorities. The philological criticism upon the third article is unsound. *Shall* is merely a sign of the

future tense, and not imperative; the laws of the United States having, in some instances, given conjoint jurisdiction to the state courts, and upon that argument must be unconstitutional. " Extend," or " shall extend," merely imports that it *may* extend. Congress are bound to establish tribunals inferior to the supreme court. How else are crimes against the United States to be punished, since the supreme court have not original jurisdiction of these cases ? The state courts are bound by treaties as a part of the supreme law of the land, and they must construe them in order to obey them. The only constitutional method of giving any greater effect to the supremacy of treaties, would have been by enabling the parties claiming under them to sue in the national courts. 3. There are three classes of cases enumerated as of appellate jurisdiction: that of treaties only applies to this case; but in this case the British treaty was not *principally*, only *incidentally*, in question. It does not appear upon the face of the record that the judgment was upon the treaty: It was not upon the treaty; the court of appeals, in their judgment, have expressly declared that it was not upon the treaty, by affirming that part of the judgment of the district court at Winchester which determined in favour of the treaty.

*Dexter*, on the same side. Every advocate is a citizen, and, on great constitutional questions, his duty to his client does not require him to conceal any opinion he may have formed. This cause may be safely carried through, without falsifying the true ex-

position of the constitution.   Believing that it is essential to the national welfare that congress should have the right of arming the courts of the United States with every authority necessary to give complete effect to the judicial powers granted by the constitution, I dissent from the court of appeals of Virginia, when they deny that the appellate jurisdiction of the national tribunals extends to cases involving the construction and validity of treaties.   But the question is, has congress provided an adequate method of exercising it?  1. Before a writ of error goes from this court to a state court, it must appear on the face of the record, 1st. That the construction or validity of a treaty is drawn in question.  2d. That the title or claim supposed to be infringed was specially set up or demanded by the party. 3d. That the state court did decide respecting the title or claim under the treaty.   In the present instance, suppose that there had been no case made, and that all the facts stated had been given in evidence, and a general verdict rendered thereon : the case is precisely in that predicament.   The determination of the court was not limited, in any degree, to the construction of a treaty, which was only one of the numerous facts stated on which the title of the parties depended.   How can this court ascertain on which of these facts the state court determined, or that it determined upon the treaty?  The alienage of Lord Fairfax's devisee, and the question whether the lands did not escheat without office found, might have been the point of decision, avoiding to con-

sider the construction or validity of the treaty, which applies only to things confiscable. Congress have not said that this court shall determine conjecturally, but that the party shall specially set up his claim on the record, in order to see whether a treaty has been infringed. He may plead the matter specially, or except to the opinion of the court; but if he chose to make an agreed case in the most general way, is this court to amend the defects of his proceeding? 2. As to the constitutionality of the judiciary act. It is agreed that the judicial powers granted by the constitution are exclusive, or exclusive in the election of congress; but that any *appellate* jurisdiction is given by the constitution is what I deny. It is neither expressed nor implied; nor is there any necessity for it: for these suits might be removed from the state courts, as are suits commenced by foreigners and citizens of different states, in the first instance, or in the moment any question touching a treaty arose, instead of being brought up by the offensive mode of a writ of error, directed to a court which is as supreme in its appropriate sphere as this court. Whether the court where the suit is commenced will, or will not, consent; the national court may take jurisdiction. If the state court pertinaciously proceeds, notwithstanding; its proceedings would be *coram non judice*. The original and the appellate jurisdiction are opposed to each other by the constitution. The first cannot regard the state courts; nor the latter: for it is only the residuum of the mass of power before given, which does not expressly include appeals from the state courts. Why is it to be supposed that the state

courts will exercise any part of that mass of power? There is no necessity for it, since the laws might provide a constitutional mode of excluding them. If they have not provided such a mode, it is not for this court to supply the defect. By attempting it, they will begin a conflict between the national and state authorities that may ultimately involve both in one common ruin. The taper of judicial discord may become the torch of civil war, and though the breath of a judge can extinguish the first, the wisdom of the statesman may not quench the latter. I lament that the courts of so patriotic a state as Virginia have denied the complete and exclusive dominion of the national government over the whole surface of the judicial power granted by the people to that government. "JOIN or DIE," was the word when we were represented as a disjointed serpent, of which Virginia was the head. From that head sprung our "immortal chief," armed with the ægis of wisdom. But that great man, and those who advised him, improvidently assented to a law, (the judiciary act,) which is neither constitutionally nor politically adapted to enforce the powers of the national courts in an amicable and pacific manner. I have never feared that this government was too strong: I have always feared it was not strong enough. I have long inclined to the belief, that the centrifugal force was greater than the centripetal. The danger is, not that we shall fall into the sun, but that we may fly off in eccentric orbits, and never return to our perihelion. But though I will struggle to preserve all the constitutional powers of the national govern-

ment, I will not strain and break the constitution itself, in order to assert them; there is danger too on that side. The poet describes the temple of Fame as situated on a mountain covered with ice. The palaces of power are on the same frail foundation; the foot of adventurous ambition often slips in the ascent, and sometimes the volcano bursts, and inundates with its lava the surrounding country. But I fear not that this court will be wanting in the firmness which becomes its station; and if it believes that it may, constitutionally, and legally, exert its powers upon the state courts, in this form, (which is what I deny,) it will not regard consequences in the exercise of its duty: it will say, with another august tribunal, " *Fiat justitia, ruat cælum!*".

*Jones*, in reply. The states are deprived, by the constitution, of the character of perfect states, as defined by jurists; they are still sovereign, *sub modo*; but the national government pervades all their territory, and acts upon all their citizens. The state judicatures are essentially incompetent to pronounce what is the law; not in the limited sphere of their territorial jurisdiction, but throughout the union and the world. The constitution, art. 3., sec. 2., has distinguished between the causes properly *national*, and " controversies" which it was thought expedient vest in the courts of the United States. The judiciary act covers the first completely, the last only partially. It is said the doctrine contended for involves the old anomaly of the national government, acting, not on individuals, but on state authorities;

but this government must act in this manner by appeal from the state courts, or it cannot act at all.   If you have an appellate jurisdiction, their judgment is your judgment.   You may execute this your judgment; you need not remand the cause to the state court.   These are mere arbitrary forms, which the court may discard, or adopt, at pleasure.   Neither is it necessary to send a writ of error to the state court; you may cite the parties themselves to appear in your forum, as soon as a question touching a treaty arises.   There is no necessary connection between an appellate tribunal and the court appealed from; it is sufficient that the parties have originally litigated before the court of first instance. The house of lords, an English common law court, holds appeals from the court of sessions, in Scotland, a civil law tribunal.   The union between that country and England is similar to our federative constitution. ' In whatever mode the appellate jurisdiction may be exercised, it is still liable to the difficulties suggested.   The process by which a cause is to be removed from the state court, before judgment, must be addressed to that court; and if it still proceeds, the remedy must be as offensive as at present.   But it would, also, be ineffectual and dilatory.   Suppose, in a case of original jurisdiction, an ambassador prosecuted for a supposed crime in a state court, he might be imprisoned, or put to death, before the national authority could be interposed, unless it act directly on the state judicature.   In this case, the court may act directly on the cause and the parties, in order to carry into complete effect the appellate powars with which it is invested by the constitution and

laws. There is nothing in the record importing that the court of appeals determined on the ground of the party's title merely. Nor is it necessary that the treaty, under which that title is set up, should be specified in a bill of exceptions, or propounded in argument. It is sufficient that the claim is stated upon the record, and that the title depends upon the treaty. This court is not to pronounce a mere abstract opinion upon the validity, or construction, of the treaty; it may, therefore, decide on other incidental matters; and, if the party has a good title under the treaty, it is to enforce and protect that title. As to the sufficiency of the return, the law merely requires a transcript of the record to be removed, and, by the rules of this court, a return by the clerk is sufficient.

STORY, J., delivered the opinion of the court.

This is a writ of error from the court of appeals of Virginia, founded upon the refusal of that court to obey the mandate of this court, requiring the judgment rendered in this very cause, at February term, 1813, to be carried into due execution. The following is the judgment of the court of appeals rendered on the mandate : " The court is unanimously of opinion, that the appellate power of the supreme court of the United States does not extend to this court, under a sound construction of the constitution of the United States; that so much of the 25th section of the act of congress to establish the judicial courts of the United States, as extends the appellate jurisdiction of the supreme court to this court, is not in pursuance of the constitution of the

1816.

Harrison
v.
Hunter's
Lessee.

March 20th.

United States; that the writ of error, in this cause, was improvidently allowed under the authority of that act; that the proceedings thereon in the supreme court were, *coram non judice*, in relation to this court, and that obedience to its mandate be declined by the court."

The questions involved in this judgment are of great importance and delicacy. Perhaps it is not too much to affirm, that, upon their right decision, rest some of the most solid principles which have hitherto been supposed to sustain and protect the constitution itself. The great respectability, too, of the court whose decisions we are called upon to review, and the entire deference which we entertain for the learning and ability of that court, add much to the difficulty of the task which has so unwelcomely fallen upon us. It is, however, a source of consolation, that we have had the assistance of most able and learned arguments to aid our inquiries; and that the opinion which is now to be pronounced has been weighed with every solicitude to come to a correct result, and matured after solemn deliberation.

Before proceeding to the principal questions, it may not be unfit to dispose of some preliminary considerations which have grown out of the arguments at the bar.

The constitution of the United States was ordained and established, not by the states in their sovereign capacities, but emphatically, as the preamble of the constitution declares, by " the people of the United States." There can be no doubt that it was competent to the people to invest the general go-

vernment with all the powers which they might deem proper and necessary; to extend or restrain these powers according to their own good pleasure, and to give them a paramount and supreme authority. As little doubt can there be, that the people had a right to prohibit to the states the exercise of any powers which were, in their judgment, incompatible with the objects of the general compact; to make the powers of the state governments, in given cases, subordinate to those of the nation, or to reserve to themselves those sovereign authorities which they might not choose to delegate to either. The constitution was not, therefore, necessarily carved out of existing state sovereignties, nor a surrender of powers already existing in state institutions, for the powers of the states depend upon their own constitutions; and the people of every state had the right to modify and restrain them, according to their own views of policy or principle. On the other hand, it is perfectly clear that the sovereign powers vested in the state governments, by their respective constitutions, remained unaltered and unimpaired, except so far as they were granted to the government of the United States.

These deductions do not rest upon general reasoning, plain and obvious as they seem to be. They have been positively recognised by one of the articles in amendment of the constitution, which declares, that " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the *states* respectively, or *to the people.*"

*1816.*

*Martin*
*v.*
*Hunter's*
*Lessee.*

The government, then, of the United States, can claim no powers which are not granted to it by the constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication. On the other hand, this instrument, like every other grant, is to have a reasonable construction, according to the import of its terms; and where a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grow out of the context expressly, or by necessary implication. The words are to be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged.

The constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution. It was foreseen that this would be a perilous and difficult, if not an impracticable, task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. It could not be foreseen what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which, at the present, might seem salutary, might, in the end, prove the overthrow of the system itself. Hence its powers are expressed in general terms, leaving to the legislature, from time to

time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom, and the public interests, should require.

With these principles in view, principles in respect to which no difference of opinion ought to be indulged, let us now proceed to the interpretation of the constitution, so far as regards the great points in controversy.

The third article of the constitution is that which must principally attract our attention. The 1st. section declares, " the judicial power of the United States shall be vested in one supreme court, and in such other inferior courts as the congress may, from time to time, ordain and establish." The 2d section declares, that " the judicial power shall extend to all cases in law or equity, arising under this constitution, the laws of the United States, and the treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state, claiming lands under the grants of different states; and between a state or the citizens thereof, and foreign states, citizens, or subjects." It then proceeds to declare, that " in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the supreme court shall have *original jurisdiction.*

In all the other cases before mentioned the supreme court shall have *appellate jurisdiction*, both as to law and fact, with such exceptions, and under such regulations, as the congress shall make."

Such is the language of the article creating and defining the judicial power of the United States. It is the voice of the whole American people solemnly declared, in establishing one great department of that government which was, in many respects, national, and in all, supreme It is a part of the very same instrument which was to act not merely upon individuals, but upon states; and to deprive them altogether of the exercise of some powers of sovereignty, and to restrain and regulate them in the exercise of others.

Let this article be carefully weighed and considered. The language of the article throughout is manifestly designed to be mandatory upon the legislature. Its obligatory force is so imperative, that congress could not, without a violation of its duty, have refused to carry it into operation. The judicial power of the United States *shall be vested* (not may be vested) in one supreme court, and in such inferior courts as congress may, from time to time, ordain and establish. Could congress have lawfully refused to create a supreme court, or to vest in it the constitutional jurisdiction? " The judges, both of the supreme and inferior courts, *shall hold* their offices during good behaviour, and *shall*, at stated times, receive, for their services, a compensation which shall not be diminished during their continuance in office." Could congress create or limit any other tenure of

the judicial office? Could they refuse to pay, at stated times, the stipulated salary, or diminish it during the continuance in office? But one answer can be given to these questions: it must be in the negative. The object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments. The first was to pass laws, the second to approve and execute them, and the third to expound and enforce them. Without the latter, it would be impossible to carry into effect some of the express provisions of the constitution. How, otherwise, could crimes against the United States be tried and punished? How could causes between two states be heard and determined? The judicial power must, therefore, be vested in some court, by congress; and to suppose that it was not an obligation binding on them, but might, at their pleasure, be omited or declined, is to suppose that, under the sanction of the constitution, they might defeat the constitution itself; a construction which would lead to such a result cannot be sound.

The same expression, " shall be vested," occurs in other parts of the constitution, in defining the powers of the other co-ordinate branches of the government. The first article declares that " all legislative powers herein granted *shall be vested* in a congress of the United States." Will it be contended that the legislative power is not absolutely vested? that the words merely refer to some future act, and mean only that the legislative power may hereafter be vested? The second article declares that " the

1816.

Martin
v.
Hunter's
Lessee.

executive power *shall be vested* in a president of the United States of America." Could congress vest it in any other person; or, is it to await their good pleasure, whether it is to vest at all? It is apparent that such a construction, in either case, would be utterly inadmissible. Why, then, is it entitled to a better support in reference to the judicial department?

If, then, it is a duty of congress to vest the judicial power of the United States, it is a duty to vest the *whole judicial power*. The language, if imperative as to one part, is imperative as to all. If it were otherwise, this anomaly would exist, that congress might successively refuse to vest the jurisdiction in any one class of cases enumerated in the constitution, and thereby defeat the jurisdiction as to all; for the constitution has not singled out any class on which congress are bound to act in preference to others.

The next consideration is as to the courts in which the judicial power shall be vested. It is manifest that a supreme court must be established; but whether it be equally obligatory to establish inferior courts, is a question of some difficulty. If congress may lawfully omit to establish inferior courts, it might follow, that in some of the enumerated cases the judicial power could nowhere exist. The supreme court can have original jurisdiction in two classes of cases only, viz. in cases affecting ambassadors, other public ministers and consuls, and in cases in which a state is a party. Congress cannot vest any portion of the judicial power of the United States, except in courts ordained and established by

itself; and if in any of the cases enumerated in the constitution, the state courts did not then possess jurisdiction, the appellate jurisdiction of the supreme court (admitting that it could act on state courts) could not reach those cases, and, consequently, the injunction of the constitution, that the judicial power " *shall be vested*," would be disobeyed. It would seem, therefore, to follow, that congress are bound to create some inferior courts, in which to vest all that jurisdiction which, under the constitution, is *exclusively* vested in the United States, and of which the supreme court cannot take original cognizance. They might establish one or more inferior courts; they might parcel out the jurisdiction among such courts, from time to time, at their own pleasure. But the whole judicial power of the United States should be, at all times, vested either in an original or appellate form, in some courts created under its authority.

This construction will be fortified by an attentive examination of the second section of the third article. The words are " the judicial power *shall extend*," &c. Much minute and elaborate criticism has been employed upon those words. It has been argued that they are equivalent to the words "may extend," and that " extend" means to widen to new cases not before within the scope of the power. For the reasons which have been already stated, we are of opinion that the words are used in an imperative sense. They import an absolute grant of judicial power. They cannot have a relative signification applicable to powers already granted; for the American *people*

had not made any previous grant. The constitution was for a new government; organized with new substantive powers, and not a mere supplementary charter to a government already existing. The confederation was a compact between states; and its structure and powers were wholly unlike those of the national government. The constitution was an act of the people of the United States to supercede the confederation, and not to be ingrafted on it, as a stock through which it was to receive life and nourishment.

If, indeed; the relative signification could be fixed upon the term " extend," it could not (as we shall hereafter see) subserve the purposes of the argument in support of which it has been adduced. This imperative sense of the words " shall extend," is strengthened by the context. It is declared that " in all cases affecting ambassadors, &c., that the supreme court *shall have* original jurisdiction." Could congress withhold original jurisdiction in these cases from the supreme court? The clause proceeds—" in all the other cases before mentioned the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations, as the congress shall make." The very exception here shows that the framers of the constitution used the words in an imperative sense. What necessity could there exist for this exception if the preceding words were not used in that sense? Without such exception, congress would, by the preceding words, have possessed a complete power to regulate the appellate jurisdiction, if the language were

only equivalent to the words " may have" appellate jurisdiction. It is apparent, then, that the exception was intended as a limitation upon the preceding words, to enable congress to regulate and restrain the appellate power, as the public interests might, from time to time, require.

Other clauses in the constitution might be brought in aid of this construction; but a minute examination of them cannot be necessary, and would occupy too much time. It will be found that whenever a particular object is to be effected, the language of the constitution is always imperative, and cannot be disregarded without violating the first principles of public duty. On the other hand, the legislative powers are given in language which implies discretion, as from the nature of legislative power such a discretion must ever be exercised.

It being, then, established that the language of this clause is imperative, the next question is as to the cases to which it shall apply. The answer is found in the constitution itself. The judicial power shall extend to all the cases enumerated in the constitution. As the mode is not limited, it may extend to all such cases, in any form, in which judicial power may be exercised. It may, therefore, extend to them in the shape of original or appellate jurisdiction, or both; for there is nothing in the nature of the cases which binds to the exercise of the one in preference to the other.

In what cases (if any) is this judicial power exclusive, or exclusive at the election of congress? It will be observed that there are two classes of cases enu-

merated in the constitution, between which a distinc-
tion seems to be drawn.   The first class includes
cases arising under the constitution, laws, and
treaties of the United States; cases affecting ambas-
sadors, other public ministers and consuls, and cases
of admiralty and maritime jurisdiction.   In this class
the expression is, and that the judicial power shall
extend to *all cases ;* but in the subsequent part of the
clause which embraces all the other cases of national
cognizance, and forms the second class, the word
" *all*" is dropped seemingly *ex industria.*   Here the
judicial authority is to extend to controversies (not
to *all* controversies) to which the United States shall
be a party, &c.   From this difference of phraseology,
perhaps, a difference of constitutional intention may,
with propriety, be inferred.   It is hardly to be pre-
sumed that the variation in the language could have
been accidental.   It must have been the result of
some determinate reason ; and it is not very difficult
to find a reason sufficient to support the apparent
change of intention.   In respect to the first class,
it may well have been the intention of the framers
of the constitution imperatively to extend the judicial
power either in an original or appellate form to *all
cases ;* and in the latter class to leave it to congress
to qualify the jurisdiction, original or appellate, in
such manner as public policy might dictate.

The vital importance of all the cases enumerated
in the first class to the national sovereignty, might
warrant such a distinction.   In the first place, as to
cases arriving under the constitution, laws, and trea-
ties of the United States.   Here the state courts

could not ordinarily possess a direct jurisdiction. The jurisdiction over such cases could not exist in the state courts previous to the adoption of the constitution, and it could not afterwards be directly conferred on them; for the constitution expressly requires the judicial power to be vested in courts ordained and established by the United States. This class of cases would embrace civil as well as criminal jurisdiction, and affect not only our internal policy, but our foreign relations. It would, therefore, be perilous to restrain it in any manner whatsoever, inasmuch as it might hazard the national safety. The same remarks may be urged as to cases affecting ambassadors, other public ministers, and consuls, who are emphatically placed under the guardianship of the law of nations; and as to cases of admiralty and maritime jurisdiction, the admiralty jurisdiction embraces all questions of prize and salvage, in the correct adjudication of which foreign nations are deeply interested; it embraces also maritime torts, contracts, and offences, in which the principles of the law and comity of nations often form an essential inquiry. All these cases, then, enter into the national policy, affect the national rights, and may compromit the national sovereignty. The original or appellate jurisdiction ought not, therefore, to be restrained, but should be commensurate with the mischiefs intended to be remedied, and, of course, should extend to all cases whatsoever.

A different policy might well be adopted in reference to the second class of cases; for although it might be fit that the ju icial power should extend

1816.

Martin
v.
Hunter's
Lessee.

to all controversies to which the United States should be a party, yet this power n..ght not have been imperatively given, least it should imply a right to take cognizance of original suits brought against the United States as defendants in their own courts. It might not have been deemed proper to submit the sovereignty of the United States, against their own will, to judicial cognizance, either to enforce rights or to prevent wrongs; and as to the other cases of the second class, they might well be left to be exercised under the exceptions and regulations which congress might, in their wisdom, choose to apply. It is also worthy of remark, that congress seem, in a good degree, in the establishment of the present judicial system, to have adopted this distinction. In the first class of cases, the jurisdiction is not limited except by the subject matter; in the second, it is made materially to depend upon the value in controversy.

We do not, however, profess to place any implicit reliance upon the distinction which has here been stated and endeavoured to be illustrated. It has the rather been brought into view in deference to the legislative opinion, which has so long acted upon, and enforced, this distinction. But there is, certainly, vast weight in the argument which has been urged, that the constitution is imperative upon congress to vest all the judicial power of the United States, in the shape of original jurisdiction, in the supreme and inferior courts created under its own authority. At all events, whether the one construction or the other prevail, it is manifest that the judicial power of the

United States is unavoidably, in some cases, exclusive of all state authority, and in all others, may be made so at the election of congress. No part of the criminal jurisdiction of the United States can, consistently with the constitution, be delegated to state tribunals. The admiralty and maritime jurisdiction is of the same exclusive cognizance ; and it can only be in those cases where, previous to the constitution, state tribunals possessed jurisdiction independent of national authority, that they can now constitutionally exercise a concurrent jurisdiction. Congress, throughout the judicial act, and particularly in the 9th, 11th, and 13th sections, have legislated upon the supposition that in all the cases to which the judicial powers of the United States extended, they might rightfully vest exclusive jurisdiction in their own courts.

But, even admitting that the language of the constitution is not mandatory, and that congress may constitutionally omit to vest the judicial power in courts of the United States, it cannot be denied that when it is vested, it may be exercised to the utmost constitutional extent.

This leads us to the consideration of the great question as to the nature and extent of the appellate jurisdiction of the United States. We have already seen that appellate jurisdiction is given by the constitution to the supreme court in all cases where it has not original jurisdiction ; subject, however, to such exceptions and regulations as congress may prescribe. It is, therefore, capable of embracing every case enumerated in the constitution, which is not exclusively to be decided by way of original

jurisdiction. But the exercise of appellate jurisdiction is far from being limited by the terms of the constitution to the supreme court. There can be no doubt that congress may create a succession of inferior tribunals, in each of which it may vest appellate as well as original jurisdiction. The judicial power is delegated by the constitution in the most general terms, and may, therefore, be exercised by congress under every variety of form, of appellate or original jurisdiction. And as there is nothing in the constitution which restrains or limits this power, it must, therefore, in all other cases, subsist in the utmost latitude of which, in its own nature, it is susceptible.

As, then, by the terms of the constitution, the appellate jurisdiction is not limited as to the supreme court, and as to this court it may be exercised in all other cases than those of which it has original cognizance, what is there to restrain its exercise over state tribunals in the enumerated cases? The appellate power is not limited by the terms of the third article to any particular courts. The words are, " the judicial power (which includes appellate power) shall extend to all cases," &c.; and " in all other cases before mentioned the supreme court shall have appellate jurisdiction." It is the *case*, then, and not *the court*, that gives the jurisdiction. If the judicial power extends to the case, it will be in vain to search in the letter of the constitution for any qualification as to the tribunal where it depends. It is incumbent, then, upon those who assert such a qualification to show its existence by necessary implication. If the

text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible.

If the constitution meant to limit the appellate jurisdiction to cases pending in the courts of the United States, it would necessarily follow that the jurisdiction of these courts would, in all the cases enumerated in the constitution, be exclusive of state tribunals. How otherwise could the jurisdiction extend to *all* cases arising under the constitution, laws, and treaties of the United States, or *to all cases* of admiralty and maritime jurisdiction? If some of these cases might be entertained by state tribunals, and no appellate jurisdiction as to them should exist, then the appellate power would not extend to *all,* but to *some,* cases. If state tribunals might exercise concurrent jurisdiction over all or some of the other classes of cases in the constitution without control, then the appellate jurisdiction of the United States might, as to such cases, have no real existence, contrary to the manifest intent of the constitution. Under such circumstances, to give effect to the judicial power, it must be construed to be exclusive; and this not only when the *casus fœderis* should arise directly, but when it should arise, incidentally, in cases pending in state courts. This construction would abridge the jurisdiction of such court far more than has been ever contemplated in any act of congress.

On the other hand, if, as has been contended, a discretion be vested in congress to establish, or not to establish, inferior courts at their own pleasure, and

1816.

Martin
v.
Hunter's
Lessee.

congress should not establish such courts, the appellate jurisdiction of the supreme court would have nothing to act upon, unless it could act upon cases pending in the state courts. Under such circumstances it must be held that the appellate power would extend to state courts ; for the constitution is peremptory that it shall extend to certain enumerated cases, which cases could exist in no other courts. Any other construction, upon this supposition, would involve this strange contradiction, that a discretionary power vested in congress, and which they might rightfully omit to exercise, would defeat the absolute injunctions of the constitution in relation to the whole appellate power.

But it is plain that the framers of the constitution did contemplate that cases within the judicial cognizance of the United States not only might but would arise in the state courts, in the exercise of their ordinary jurisdiction. With this view the sixth article declares, that " this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." It is obvious that this obligation is imperative upon the state judges in their official, and not merely in their private, capacities. From the very nature of their judicial duties they would be called upon to pronounce the law applicable to the case in judgment. They were not to decide merely

according to the laws or constitution of the state, but according to the constitution, laws and treaties of the United States—" the supreme law of the land."

A moment's consideration will show us the necessity and propriety of this provision in cases where the jurisdiction of the state courts is unquestionable. Suppose a contract for the payment of money is made between citizens of the same state, and performance thereof is sought in the courts of that state; no person can doubt that the jurisdiction completely and exclusively attaches, in the first instance, to such courts. Suppose at the trial the defendant sets up in his defence a tender under a state law, making paper money a good tender, or a state law, impairing the obligation of such contract, which law, if binding, would defeat the suit. The constitution of the United States has declared that no state shall make any thing but gold or silver coin a tender in payment of debts, or pass a law impairing the obligation of contracts. If congress shall not have passed a law providing for the removal of such a suit to the courts of the United States, must not the state court proceed to hear and determine it? Can a mere plea in defence be of itself a bar to further proceedings, so as to prohibit an inquiry into its truth or legal propriety, when no other tribunal exists to whom judicial cognizance of such cases is confided? Suppose an indictment for a crime in a state court, and the defendant should allege in his defence that the crime was created by an *ex post facto* act of the state, must not the state court, in the exercise of a jurisdiction which has already rightfully attached, have a

right to pronounce on the validity and sufficiency of the defence? It would be extremely difficult, upon any legal principles, to give a negative answer to these inquiries. Innumerable instances of the same sort might be stated, in illustration of the position; and unless the state courts could sustain jurisdiction in such cases, this clause of the sixth article would be without meaning or effect, and public mischiefs, of a most enormous magnitude, would inevitably ensue.

It must, therefore, be conceded that the constitution not only contemplated, but meant to provide for cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States. Yet to all these cases the judicial power, by the very terms of the constitution, is to extend. It cannot extend by original jurisdiction if that was already rightfully and exclusively attached in the state courts, which (as has been already shown) may occur; it must, therefore, extend by appellate jurisdiction, or not at all. It would seem to follow that the appellate power of the United States must, in such cases, extend to state tribunals; and if in such cases, there is no reason why it should not equally attach upon all others within the purview of the constitution.

It has been argued that such an appellate jurisdiction over state courts is inconsistent with the genius

of our governments, and the spirit of the constitution.

That the latter was never designed to act upon state sovereignties, but only upon the people, and that if the power exists, it will materially impair the sovereignty of the states, and the independence of their courts. We cannot yield to the force of this reasoning; it assumes principles which we cannot admit, and draws conclusions to which we do not yield our assent.

It is a mistake that the constitution was not designed to operate upon states, in their corporate capacities. It is crowded with provisions which restrain or annul the sovereignty of the states in some of the highest branches of their prerogatives. The tenth section of the first article contains a long list of disabilities and prohibitions imposed upon the states. Surely, when such essential portions of state sovereignty are taken away, or prohibited to be exercised, it cannot be correctly asserted that the constitution does not act upon the states. The language of the constitution is also imperative upon the states as to the performance of many duties. It is imperative upon the state legislatures to make laws prescribing the time, places, and manner of holding elections for senators and representatives, and for electors of president and vice-president. And in these, as well as some other cases, congress have a right to revise, amend, or supercede the laws which may be passed by state legislatures. When, therefore, the states are stripped of some of the highest attributes of sovereignty, and the same are given to the United States; when the legislatures of the states are, in some

respects, under the control of congress, and in every case are, under the constitution, bound by the paramount authority of the United States; it is certainly difficult to support the argument that the appellate power over the decisions of state courts is contrary to the genius of our institutions. The courts of the United States can, without question, revise the proceedings of the executive and legislative authorities of the states, and if they are found to be contrary to the constitution, may declare them to be of no legal validity. Surely the exercise of the same right over judicial tribunals is not a higher or more dangerous act of sovereign power.

Nor can such a right be deemed to impair the independence of state judges. It is assuming the very ground in controversy to assert that they possess an absolute independence of the United States. In respect to the powers granted to the United States, they are not independent; they are expressly bound to obedience by the letter of the constitution; and if they should unintentionally transcend their authority, or misconstrue the constitution, there is no more reason for giving their judgments an absolute and irresistible force, than for giving it to the acts of the other co-ordinate departments of state sovereignty.

The argument urged from the possibility of the abuse of the revising power, is equally unsatisfactory. It is always a doubtful course, to argue against the use or existence of a power, from the possibility of its abuse. It is still more difficult, by such an argument, to ingraft upon a general power a restric-

tion which is not to be found in the terms in which it is given. From the very nature of things, the absolute right of decision, in the last resort, must rest somewhere—wherever it may be vested it is susceptible of abuse. In all questions of jurisdiction the inferior, or appellate court, must pronounce the final judgment; and common sense, as well as legal reasoning, has conferred it upon the latter.

It has been further argued against the existence of this appellate power, that it would form a novelty in our judicial institutions. This is certainly a mistake. In the articles of confederation, an instrument framed with infinitely more deference to state rights and state jealousies, a power was given to congress to establish " courts for revising and determining, finally, *appeals* in all cases of captures." It is remarkable, that no power was given to entertain *original* jurisdiction in such cases; and, consequently, the appellate power (although not so expressed in terms) was altogether to be exercised in revising the decisions of state tribunals. This was, undoubtedly, so far a surrender of state sovereignty; but it never was supposed to be a power fraught with public danger, or destructive of the independence of state judges. On the contrary, it was supposed to be a power indispensable to the public safety, inasmuch as our national rights might otherwise be compromitted, and our national peace been dangered. Under the present constitution the prize jurisdiction is confined to the courts of the United States; and a power to revise the decisions of state courts, if they should assert jurisdiction over prize causes, cannot be less

important, or less useful, than it was under the confederation.

In this connexion we are led again to the construction of the words of the constitution, " the judicial power shall extend," &c. If, as has been contended at the bar, the term "extend" have a relative signification, and mean to widen an existing power, it will then follow, that, as the confederation gave an appellate power over state tribunals, the constitution enlarged or widened that appellate power to all the other cases in which jurisdiction is given to the courts of the United States. It is not presumed that the learned counsel would choose to adopt such a conclusion.

It is further argued, that no great public mischief can result from a construction which shall limit the appellate power of the United States to cases in their own courts : first, because state judges are bound by an oath to support the constitution of the United States, and must be presumed to be men of learning and integrity; and, secondly, because congress must have an unquestionable right to remove all cases within the scope of the judicial power from the state courts to the courts of the United States, at any time before final judgment, though not after final judgment. As to the first reason—admitting that the judges of the state courts are, and always will be, of as much learning, integrity, and wisdom, as those of the courts of the United States, (which we very cheerfully admit,) it does not aid the argument. It is manifest that the constitution has proceeded upon a theory of its own, and given or with-

held powers according to the judgment of the American people, by whom it was adopted. We can only construe its powers, and cannot inquire into the policy or principles which induced the grant of them. The constitution has presumed (whether rightly or wrongly we do not inquire) that state attachments, state prejudices, state jealousies, and state interests, might sometimes obstruct, or control, or be supposed to obstruct or control, the regular administration of justice. Hence, in controversies between states; between citizens of different states; between citizens claiming grants under different states; between a state and its citizens, or foreigners, and between citizens and foreigners, it enables the parties, under the authority of congress, to have the controversies heard, tried, and determined before the national tribunals. No other reason than that which has been stated can be assigned, why some, at least, of those cases should not have been left to the cognizance of the state courts. In respect to the other enumerated cases—the cases arising under the constitution, laws, and treaties of the United States, cases affecting ambassadors and other public ministers, and cases of admiralty and maritime jurisdiction—reasons of a higher and more extensive nature, touching the safety, peace, and sovereignty of the nation, might well justify a grant of exclusive jurisdiction.

This is not all. A motive of another kind, perfectly compatible with the most sincere respect for state tribunals, might induce the grant of appellate power over their decisions. That motive is the importance, and even necessity of *uniformity* of deci-

sions throughout the whole United States, upon all subjects within the purview of the constitution. Judges of equal learning and integrity, in different states, might differently interpret a statute, or a treaty of the United States, or even the constitution itself: If there were no revising authority to control these jarring and discordant judgments, and harmonize them into uniformity, the laws, the treaties, and the constitution of the United States would be different in different states, and might, perhaps, never have precisely the same construction, obligation, or efficacy, in any two states. The public mischiefs that would attend such a state of things would be truly deplorable; and it cannot be believed that they could have escaped the enlightened convention which formed the constitution. What, indeed, might then have been only prophecy, has now become fact; and the appellate jurisdiction must continue to be the only adequate remedy for such evils.

There is an additional consideration, which is entitled to great weight. The constitution of the United States was designed for the common and equal benefit of all the people of the United States. The judicial power was granted for the same benign and salutary purposes. It was not to be exercised exclusively for the benefit of parties who might be plaintiffs, and would elect the national forum, but also for the protection of defendants who might be entitled to try their rights, or assert their priviliges, before the same forum. Yet, if the construction contended for be correct, it will follow, that as the plaintiff may always elect the state court, the de-

fendant may be deprived of all the security which
the constitution intended in aid of his rights. Such
a state of things can, in no respect, be considered as
giving equal rights. To obviate this difficulty, we
are referred to the power which it is admitted
congress possess to remove suits from state courts to
the national courts; and this forms the second
ground upon which the argument we are consider-
ing has been attempted to be sustained.

. This power of removal is not to be found in ex-
press terms in any part of the constitution; if it be
given, it is only given by implication, as a power ne-
cessary and proper to carry into effect some express
power. The power of removal is certainly not, in strict-
ness of language; it presupposes an exercise of origi-
nal jurisdiction to have attached elsewhere. The ex-
istence of this power of removal is familiar in courts act-
ing according to the course of the common law in cri-
minal as well as civil cases, and it is exercised before
as well as after judgment. But this is always
deemed in both cases an exercise of appellate, and
not of original jurisdiction. If, then, the right of
removal be included in the appellate jurisdiction, it is
only because it is one mode of exercising that power,
and as congress is not limited by the constitution to
any particular mode, or time of exercising it, it may
authorize a removal either before or after judgment.
The time, the process, and the manner, must be sub-
ject to its absolute legislative control. A writ of
error is, indeed, but a process which removes the
record of one court to the possession of another court,

Martin
v.
Hunter's
Lessee.

and enables the latter to inspect the proceedings, and give such judgment as its own opinion of the law and justice of the case may warrant. There is nothing in the nature of the process which forbids it from being applied by the legislature to interlocutory as well as final judgments. And if the right of removal from state courts exist before judgment, because it is included in the appellate power, it must, for the same reason, exist after judgment. And if the appellate power by the constitution does not include cases pending in state courts, the right of removal, which is but a mode of exercising that power, cannot be applied to them. Precisely the same objections, therefore, exist as to the right of removal before judgment, as after, and both must stand or fall together. Nor, indeed, would the force of the arguments on either side materially vary, if the right of removal were an exercise of original jurisdiction. It would equally trench upon the jurisdiction and independence of state tribunals.

The remedy, too, of removal of suits would be utterly inadequate to the purposes of the constitution, if it could act only on the parties, and not upon the state courts. In respect to criminal prosecutions, the difficulty seems admitted to be insurmountable; and, in respect to civil suits, there would, in many cases, be rights without corresponding remedies. If state courts should deny the constitutionality of the authority to remove suits from their cognizance, in what manner could they be compelled to relinquish the jurisdiction? In respect to criminal cases, there would at once be an end of all control, and the

state decisions would be paramount to the constitution; and though in civil suits the courts of the United States might act upon the parties, yet the state courts might act in the same way; and this conflict of jurisdictions would not only jeopardise private rights, but bring into imminent peril the public interests.

On the whole, the court are of opinion, that the appellate power of the United States does extend to cases pending in the state courts; and that the 25th section of the judiciary act, which authorizes the exercise of this jurisdiction in the specified cases, by a writ of error, is supported by the letter and spirit of the constitution. We find no clause in that instrument which limits this power; and we dare not interpose a limitation where the people have not been disposed to create one.

Strong as this conclusion stands upon the general language of the constitution, it may still derive support from other sources. It is an historical fact, that this exposition of the constitution, extending its appellate power to state courts, was, previous to its adoption, uniformly and publicly avowed by its friends, and admitted by its enemies, as the basis of their respective reasonings, both in and out of the state conventions. It is an historical fact, that at the time when the judiciary act was submitted to the deliberations of the first congress, composed, as it was, not only of men of great learning and ability, but of men who had acted a principal part in framing, supporting, or opposing that constitution, the same exposition was explicitly declared and admitted by the friends and by the opponents of that system. It

1816.

Martin
v.
Hunter's
Lessee.

is an historical fact, that the supreme court of the United States have, from time to time, sustained this appellate jurisdiction in a great variety of cases, brought from the tribunals of many of the most important states in the union, and that no state tribunal has ever breathed a judicial doubt on the subject, or declined to obey the mandate of the supreme court, until the present occasion. This weight of contemporaneous exposition by all parties, this acquiescence of enlightened state courts, and these judicial decisions of the supreme court through so long a period, do, as we think, place the doctrine upon a foundation of authority which cannot be shaken, without delivering over the subject to perpetual and irremediable doubts.

The next question which has been argued, is, whether the case at bar be within the purview of the 25th section of the judiciary act, so that this court may rightfully sustain the present writ of error. This section, stripped of passages unimportant in this inquiry, enacts, in substance, that a final judgment or decree in any suit in the highest court of law or equity of a state, where is drawn in question the validity of a treaty or statute of, or an authority excised under, the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any state, on the ground of their being repugnant to the constitution, treaties, or laws, of the United States, and the decision is in favour of such their validity; or of the constitution, or of a treaty or statute of, or commission held under, the United

States, and *the decision is against the title, right, privilege, or exemption, specially set up or claimed by either party under such* clause of the said constitution, treaty, statute, or commission, may be re-examined and reversed or affirmed in the supreme court of the United States, upon a writ of error, in the same manner, and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered or passed in a circuit court, and the proceeding upon the reversal shall also be the same, *except that the supreme court, instead of remanding the cause for a final decision, as before provided, may, at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution.* But no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, *than such as appears upon the face of the record, and immediately respects the before-mentioned question* of validity or construction of the said constitution, treaties, statutes, commissions, or authorities in dispute.

That the present writ of error is founded upon a judgment of the court below, which drew in question and denied the validity of a statute of the United States, is incontrovertible, for it is apparent upon the face of the record. That this judgment is final upon the rights of the parties is equally true; for if well founded, the former judgment of that court was of conclusive authority, and the former judgment of this court utterly void. The decision was, therefore, equivalent to a perpetual stay of proceedings upon

1816.

Martin
v.
Hunter's
Lessee.

the mandate, and a perpetual denial of all the rights acquired under it. The case, then, falls directly within the terms of the act. It is a final judgment in a suit in a state court, denying the validity of a statute of the United States; and unless a distinction can be made between proceedings under a mandate, and proceedings in an original suit, a writ of error is the proper remedy to revise that judgment. In our opinion no legal distinction exists between the cases.

In causes remanded to the circuit courts, if the mandate be not correctly executed, a writ of error or appeal has always been supposed to be a proper remedy, and has been recognized as such in the former decisions of this court. The statute gives the same effect to writs of error from the judgments of state courts as of the circuit courts; and in its terms provides for proceedings where the same cause may be a second time brought up on writ of error before the supreme court. There is no limitation or description of the cases to which the second writ of error may be applied; and it ought, therefore, to be co-extensive with the cases which fall within the mischiefs of the statute. It will hardly be denied that this cause stands in that predicament; and if so, then the appellate jurisdiction of this court has rightfully attached.

But it is contended, that the former judgment of this court was rendered upon a case not within the purview of this section of the judicial act, and that as it was pronounced by an incompetent jurisdiction, it was utterly void, and cannot be a sufficient founda-

tion to sustain any subsequent proceedings. To this argument several answers may be given. In the first place, it is not admitted that, upon this writ of error, the former record is before us. The error now assigned is not in the former proceedings, but in the judgment rendered upon the mandate issued after the former judgment. The question now litigated is not upon the construction of a treaty, but upon the constitutionality of a statute of the United States, which is clearly within our jurisdiction. In the next place, in ordinary cases a second writ of error has never been supposed to draw in question the propriety of the first judgment, and it is difficult to perceive how such a proceeding could be sustained upon principle. A final judgment of this court is supposed to be conclusive upon the rights which it decides, and no statute has provided any process by which this court can revise its own judgments. In several cases which have been former'y adjudged in this court, the same point was argued by counsel, and expressly overruled. It was solemnly held that a final judgment of this court was conclusive upon the parties, and could not be re-examined.

In this case, however, from motives of a public nature, we are entirely willing to wave all objections, and to go back and re-examine the question of jurisdiction as it stood upon the record formerly in judgment. We have great confidence that our jurisdiction will, on a careful examination, stand confirmed as well upon principle as authority. It will be recollected that the action was an ejectment for a parcel of land in the Northern Neck, formerly belonging to

1816.

Martin
v.
Hunter's
Lessee.

Lord Fairfax. The original plaintiff claimed the land under a patent granted to him by the state of Virginia, in 1789, under a title supposed to be vested in that state by escheat or forfeiture. The original defendant claimed the land as devisee under the will of Lord Fairfax. The parties agreed to a special statement of facts in the nature of a special verdict, upon which the district court of Winchester, in 1793, gave a general judgment for the defendant, which judgment was afterwards reversed in 1810, by the court of appeals, and a general judgment was rendered for the plaintiff; and from this last judgment a writ of error was brought to the supreme court. The statement of facts contained a regular deduction of the title of Lord Fairfax until his death, in 1781, and also the title of his devisee. It also contained a regular deduction of the title of the plaintiff, under the state of Virginia, and further referred to the treaty of peace of 1783, and to the acts of Virginia respecting the lands of Lord Fairfax, and the supposed escheat or forfeiture thereof, as component parts of the case. No facts disconnected with the titles thus set up by the parties were alleged on either side. It is apparent, from this summary explanation, that the title thus set up by the plaintiff might be open to other objections; but the title of the defendant was perfect and complete, if it was protected by the treaty of 1783. If, therefore, this court had authority to examine into the whole record, and to decide upon the legal validity of the title of the defendant, as well as its application to the treaty of peace, it would be a case within the express pur-

view of the 25th section of the act; for there was nothing in the record upon which the court below could have decided but upon the title as connected with the treaty; and if the title was otherwise good, its sufficiency must have depended altogether upon its protection under the treaty. Under such circumstances it was strictly a suit where was drawn in question the construction of a treaty, and the decision was against the title specially set up or claimed by the defendant. It would fall, then, within the very terms of the act.

The objection urged at the bar is, that this court cannot inquire into the title, but simply into the correctness of the construction put upon the treaty by the court of appeals; and that their judgment is not re-examinable here, unless it appear on the face of the record that some construction was put upon the treaty. If, therefore, that court might have decided the case upon the invalidity of the title, (and, *non constat*, that they did not,) independent of the treaty, there is an end of the appellate jurisdiction of this court. In support of this objection much stress is laid upon the last clause of the section, which declares, that no other cause shall be regarded as a ground of reversal than such as appears *on the face* of the record and *immediately* respects the construction of the treaty, &c., in dispute.

If this be the true construction of the section, it will be wholly inadequate for the purposes which it professes to have in view, and may be evaded at pleasure. But we see no reason for adopting this narrow construction; and there are the strongest

reasons against it, founded upon the words as well as the intent of the legislature. What is the case for which the body of the section provides a remedy by *writ of error ?* The answer must be in the words of the section, a suit where is drawn in question the construction of a treaty, and the decision is against *the title set up by the party.* It is, therefore, the decision against the title set up with reference to the treaty, and not the mere abstract construction of the treaty itself, upon which the statute intends to found the appellate jurisdiction. How, indeed, can it be possible to decide whether a title be within the protection of a treaty, until it is ascertained what that title is, and whether it have a legal validity ? From the very necessity of the case, there must be a preliminary inquiry into the existence and structure of the title, before the court can construe the treaty in reference to that title. If the court below should decide, that the title was bad, and, therefore, not protected by the treaty, must not this court have a power to decide the title to be good, and, therefore, protected by the treaty ? Is not the treaty, in both instances, equally construed, and the title of the party, in reference to the treaty, equally ascertained and decided ? Nor does the clause relied on in the objection, impugn this construction. It requires, that the error upon which the appellate court is to decide, shall appear on the face of the record, and *immediately respect* the questions before mentioned in the section. One of the questions is as to the construction of a treaty upon a title specially set up by a party, and every error that immediately respects

that question, must, of course, be within the cogni-
zance of the court.   The title set up in this case is
apparent upon the face of the record, and immediate-
ly respects the decision of that question; any error,
therefore, in respect to that title must be re-examin-
able, or the case could never be presented to the
court.

   The restraining clause was manifestly intended for
a very different purpose.   It was foreseen that the
parties might claim under various titles, and might as-
sert various defences, altogether independent of each
other.   The court might admit or reject evidence
applicable to one particular title, and not to all, and
in such cases it was the intention of congress to li-
mit what would otherwise have unquestionably at-
tached to the court, the right of revising all the
points involved in the cause.   It therefore restrains
this right to such errors as respect the questions
specified in the section; and in this view, it has an
appropriate sense, consistent with the preceding
clauses.   We are, therefore, satisfied, that, upon
principle, the case was rightfully before us, and if
the point were perfectly new, we should not hesitate
to assert the jurisdiction.

   But the point has been already decided by this
court upon solemn argument.   In Smith v. The State
of Maryland, (6 *Cranch*, 286.,) precisely the same
objection was taken by counsel, and overruled by
the unanimous opinion of the court.   That case was,
in some respects, stronger than the present; for the
court below decided, expressly, that the party had no
title, and, therefore, the treaty could not operate

1816.
Martin
v.
Hunter's
Lessee.

upon it.   This court entered into an examination of that question, and being of the same opinion, affirmed the judgment.   There cannot, then, be an authority which could more completely govern the present question.

It has been asserted at the bar that, in point of fact, the court of appeals did not decide either upon the treaty or the title apparent upon the record, but upon a compromise made under an act of the legislature of Virginia.   If it be true (as we are informed) that this was a private act, to take effect only upon a certain condition, viz. the execution of a deed of release of certain lands, which was matter *in pais*, it is somewhat difficult to understand how the court could take judicial cognizance of the act, or of the performance of the condition, unless spread upon the record.   At all events, we are bound to consider that the court did decide upon the facts actually before them.   The treaty of peace was not necessary to have been stated, for it was the supreme law of the land, of which all courts must take notice.   And at the time of the decision in the court of appeals and in this court, another treaty had intervened, which attached itself to the title in controversy, and, of course, must have been the supreme law to govern the decision, if it should be found applicable to the case.   It was in this view that this court did not deem it necessary to rest its former decision upon the treaty of peace, believing that the title of the defendant was, at all events, perfect under the treaty of 1794.

The remaining questions respect more the practice than the principles of this court. The forms of process, and the modes of proceeding in the exercise of jurisdiction are, with few exceptions, left by the legislature to be regulated and changed as this court may, in its discretion, deem expedient. By a rule of this court, the return of a copy of a record of the proper court, under the seal of that court, annexed to the writ of error, is declared to be " a sufficient compliance with the mandate of the writ." The record, in this case, is duly certified by the clerk of the court of appeals, and annexed to the writ of error. The objection, therefore, which has been urged to the sufficiency of the return, cannot prevail.

Another objection is, that it does not appear that the judge who granted the writ of error did, upon issuing the citation, take the bond required by the 22d section of the judiciary act.

We consider that provision as merely directory to the judge; and that an omission does not avoid the writ of error. If any party be prejudiced by the omission, this court can grant him summary relief, by imposing such terms on the other party as, under all the circumstances, may be legal and proper. But there is nothing in the record by which we can judicially know whether a bond has been taken or not; for the statute does not require the bond to be returned to this court, and it might, with equal propriety, be lodged in the court below, who would ordinarily execute the judgment to be rendered on the writ. And the presumption of law is, until the con-

1816.

Martin
v.
Hunter's
Lessee.

1816.

Martin
v.
Hunter's
Lessee.

trary appears, that every judge who signs a citation has obeyed the injunctions of the act.

We have thus gone over all the principal questions in the cause, and we deliver our judgment with entire confidence, that it is consistent with the constitution and laws of the land.

We have not thought it incumbent on us to give any opinion upon the question, whether this court have authority to issue a writ of mandamus to the court of appeals to enforce the former judgments, as we do not think it necessarily involved in the decision of this cause.

It is the opinion of the whole court, that the judgment of the court of appeals of Virginia, rendered on the mandate in this cause, be reversed, and the judgment of the district court, held at Winchester, be, and the same is hereby affirmed.

JOHNSON, J. It will be observed in this case, that the court disavows all intention to decide on the right to issue compulsory process to the state courts; thus leaving us, in my opinion, where the constitution and laws place us—supreme over persons and cases as far as our judicial powers extend, but not asserting any compulsory control over the state tribunals.

In this view I acquiesce in their opinion, but not altogether in the reasoning, or opinion, of my brother who delivered it. Few minds are accustomed to the same habit of thinking, and our conclusions are most satisfactory to ourselves when arrived at in our own way.

I have another reason for expressing my opinion on this occasion. I view this question as one of the most momentous importance; as one which may affect, in its consequences, the permanence of the American union. It presents an instance of collision between the judicial powers of the union, and one of the greatest states in the union, on a point the most delicate and difficult to be adjusted. On the one hand, the general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers. Force, which acts upon the physical powers of man, or judicial process, which addresses itself to his moral principles or his fears, are the only means to which governments can resort in the exercise of their authority. The former is happily unknown to the genius of our constitution, except as far as it shall be sanctioned by the latter; but let the latter be obstructed in its progress by an opposition which it cannot overcome or put by, and the resort must be to the former, or government is no more.

On the other hand, so firmly am I persuaded that the American people can no longer enjoy the blessings of a free government, whenever the state sovereignties shall be prostrated at the feet of the general government, nor the proud consciousness of equality and security, any longer than the independence of judicial power shall be maintained consecrated and intangible, that I could borrow the language of a celebrated orator, and exclaim, " I rejoice that Virginia has resisted."

Yet here I must claim the privilege of expressing

1816.
Martin
v.
Hunter's
Lessee.

my regret, that the opposition of the high and truly respected tribunal of that state had not been marked with a little more moderation. The only point necessary to be decided in the case then before them was, " *whether they were bound to obey the mandate emanating from this court?*" But in the judgment entered on their minutes, they have affirmed that the case was, in this court, *coram non judice*, or, in other words, that this court had not jurisdiction over it.

This is assuming a truly alarming latitude of judicial power. Where is it to end? It is an acknowledged principle of, I believe, every court in the world, that not only the decisions, but every thing done under the judicial process of courts, not having jurisdiction, are, *ipso facto*, void. Are, then, the judgments of this court to be reviewed in every court of the union? and is every recovery of money, every change of property, that has taken place under our process, to be considered as null, void, and tortious?

We pretend not to more infallibility than other courts composed of the same frail materials which compose this. It would be the height of affectation to close our minds upon the recollection that we have been extracted from the same seminaries in which originated the learned men who preside over the state tribunals. But there is one claim which we can with confidence assert *in our own name* upon those tribunals—the profound, uniform, and unaffected respect which this court has always exhibited for state decisions, give us strong pretensions to judicial comity. And another claim I may assert, in *the name of the American people;* in this court, every state in

the union is represented; we are constituted by the voice of the union, and when decisions take place, which nothing but a spirit to give ground and harmonize can reconcile, ours is the superor claim upon the comity of the state tribunals. It is the nature of the human mind to press a favourite hypothesis too far, but magnanimity will always be ready to sacrifice the pride of opinion to public welfare.

In the case before us, the collision has been, on our part, wholly unsolicited. The exercise of this appellate jurisdiction over the state decisions has long been acquiesced in, and when the writ of error, in this case, was allowed *by the president of the court of appeals of Virginia,* we were sanctioned in supposing that we were to meet with the same acquiescence there. Had that court refused to grant the writ in the first instance, or had the question of jurisdiction, or on the mode of exercising jurisdiction, been made here originally, we should have been put on our guard, and might have so modelled the process of the court as to strip it of the offensive form of a mandate. In this case it might have been brought down to what probably the 25th section of the judiciary act meant it should be, to wit, an alternative judgment, either that the state court may finally proceed, at its option, to carry into effect the judgment of this court, or, if it declined doing so, that then this court would proceed itself to execute it. The language, sense, and operation of the 25th section on this subject, merit particular attention. In the preceding section, which has relation to causes brought up by writ of error from the circuit courts

of the United States, this court is instructed not to issue executions, but to send a special mandate to the circuit court to award execution thereupon. In case of the circuit court's refusal to obey such mandate, there could be no doubt as to the ulterior measures; compulsory process might, unquestionably, be resorted to. Nor, indeed, was there any reason to suppose that they ever would refuse; and, therefore, there is no provision made for authorizing this court to execute its own judgment in cases of that description. But not so, in cases brought up from the state courts; the framers of that law plainly foresaw that the state courts might refuse; and not being willing to leave ground for the implication, that compulsory process must be resorted to, because no specific provision was made, they have provided the means, by authorizing this court, in case of reversal of the state decision, to execute its own judgment. In case of *reversal* only was this necessary; for, in case of affirmance, this collision could not arise. It is true, that the words of this section are, that this court may, *in their discretion,* proceed to execute its own judgment. But these words were very properly put in, that it might not be made imperative upon this court to proceed indiscriminately in this way; as it could only be necessary in case of the refusal of the state courts; and this idea is fully confirmed by the words of the 13th section, which restrict this court in issuing the writ of mandamus, so as to confine it expressly to those courts which are constituted by the United States.

In this point of view the legislature is completely vindicated from all intention to violate the independence of the state judiciaries. Nor can this court, with any more correctness, have imputed to it similar intentions. The form of the mandate issued in this case is that known to appellate tribunals, and used in the ordinary cases of writs of error from the courts of the United States. It will, perhaps, not be too much, in such cases, to expect of those who are conversant in the forms, fictions, and technicality of the law, not to give the process of courts too literal a construction. They should be considered with a view to the ends they are intended to answer, and the law and practice in which they originate. In this view, the mandate was no more than a mode of submitting to that court the option which the 25th section holds out to them.

Had the decision of the court of Virginia been confined to the point of their legal obligation to carry the judgment of this court into effect, I should have thought it unnecessary to make any further observations in this cause. But we are called upon to vindicate our general revising power, and its due exercise in this particular case.

Here, that I may not be charged with arguing upon a hypothetical case, it is necessary to ascertain what the real question is which this court is now called to decide on.

In doing this, it is necessary to do what, although, in the abstract, of very questionable propriety, appears to be generally acquiesced in, to wit, to review the case as it originally came up to this court

Martin
v.
Hunter's
Lessee.

on the former writ of error. The cause, then, came up upon a case stated between the parties, and under the practice of that state, having the effect of a special verdict. The case stated brings into view the treaty of peace with Great Britain, and then proceeds to present the various laws of Virginia, and the facts upon which the parties found their respective titles. It then presents no particular question, but refers generally to the law arising out of the case. The original decision was obtained prior to the treaty of 1794, but before the case was adjudicated in this court, the treaty of 1794 had been concluded.

The difficulties of the case arise under the construction of the 25th section above alluded to, which, as far as it relates to this case, is in these words: " A final judgment or decree in any suit, in the highest court of law or equity of a state in which a decision in the suit could be had," " where is drawn in question the construction of any clause of the constitution or of a treaty," " and the decision is against *the title* set up or claimed by either party under such clause, may be re-examined and reversed, or affirmed." " But no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, than such as appears on the face of the record, and immediately respects the before-mentioned questions of validity or construction of the said treaties," &c.

The first point decided under this state of the case was, that the judgment being a part of the record, if that judgment was not such as, upon that case, it ought to have been, it was an error apparent on the

face of the record. But it was contended that the case there stated presented a number of points upon which the decision below may have been founded, and that it did not, therefore, necessarily appear to have been an error immediately respecting a question on the construction of a treaty. But the court held, that as the reference was general to the law arising out of the case, if one question arose, which called for the construction of a treaty, and the decision negatived the right set up under it, this court will reverse that decision, and that it is the duty of the party who would avoid the inconvenience of this principle, so to mould the case as to obviate the ambiguity. And under this point arises the question whether this court can inquire into the title of the party, or whether they are so restricted in their judicial powers as to be confined to decide on the operation of a treaty upon a title previously ascertained to exist.

If there is any one point in the case on which an opinion may be given with confidence, it is this, whether we consider the letter of the statute, or the spirit, intent, or meaning, of the constitution and of the legislature, as expressed in the 27th section, it is equally clear that the title is the primary object to which the attention of the court is called in every such case. The words are, "and the decision be against *the title,*" so set up, not against *the construction of the treaty* contended for by the party setting up the title. And how could it be otherwise? The title may exist, notwithstanding the decision of the state courts to the contrary; and in that case the

party is entitled to the benefits intended to be secured by the treaty. The decision to his prejudice may have been the result of those very errors, partialities, or defects, in state jurisprudence against which the constitution intended to protect the individual. And if the contrary doctrine be assumed, what is the consequence? This court may then be called upon to decide on a mere hypothetical case—to give a construction to a treaty without first deciding whether there was any interest on which that treaty, whatever be its proper construction, would operate. This difficulty was felt, and weighed in the case of Smith and the State of Maryland, and that decision was founded upon the idea that this court was not thus restricted.

But another difficulty presented itself: the treaty of 1794 had become the supreme law of the land since the judgment rendered in the court below. The defendant, who was at that time an alien, had now become confirmed in his rights under that treaty. This would have been no objection to the correctness of the original judgment. Were we, then, at liberty to notice that treaty in rendering the judgment of this court?

Having dissented from the opinion of this court in the original case, on the question of title, this difficulty did not present itself in my way in the view I then took of the case. But the majority of this court determined that, as a public law, the treaty was a part of the law of every case depending in this court; that, as such, it was not necessary that it should be spread upon the record, and that it was obligatory

upon this court, in rendering judgment upon this writ of error, notwithstanding the original judgment may have been otherwise unimpeachable. And to this opinion I yielded my hearty consent; for it cannot be maintained that this court is bound to give a judgment unlawful at the time of rendering it, in consideration that the same judgment would have been lawful at any prior time. What judgment can now be lawfully rendered between the parties is the question to which the attention of the court is called. And if the law which sanctioned the original judgment expire, pending an appeal, this court has repeatedly reversed the judgment below, although rendered whilst the law existed. So, too, if the plaintiff in error die, pending suit, and his land descend on an alien, it cannot be contended that this court will maintain the suit in right of the judgment, in favour of his ancestor, notwithstanding his present disability.

It must here be recollected, that this is an action of ejectment. If the term formally declared upon expires pending the action, the court will permit the plaintiff to amend, by extending the term—why? Because, although the right may have been in him at the commencement of the suit, it has ceased before judgment, and without this amendment he could not have judgment. But suppose the suit were really instituted to obtain possession of a leasehold, and the lease expire before judgment, would the court permit the party to amend in opposition to the right of the case? On the contrary, if the term formally declared on were more extensive than the

lease in wnich the legal title was founded, could they give judgment for more than costs? It must be recollected that, under this judgment, a *writ of restitution* is the fruit of the law. This, in its very nature, has relation to, and must be founded upon, a present existing right at the time of judgment. And whatever be the cause which takes this right away, the remedy must, in the reason and nature of things, fall with it.

When all these incidental points are disposed of, we find the question finally reduced to this—does the judicial power of the United States extend to the revision of decisions of state courts, in cases arising under treaties? But, in order to generalize the question, and present it in the true form in which it presents itself in this case, we will inquire whether the constitution sanctions the exercise of a revising power over the decisions of state tribunals in those cases to which the judicial power of the United States extends?

And here it appears to me that the great difficulty is on the other side. That the real doubt is, whether the state tribunals can constitutionally exercise jurisdiction in any of the cases to which the judicial power of the United States extends.

Some cession of judicial power is contemplated by the third article of the constitution: that which is ceded can no longer be retained. In one of the circuit courts of the United States, it has been decided (with what correctness I will not say) that the cession of a power to pass an uniform act of bankruptcy, although not acted on by the United States, de-

prives the states of tne power oi passing laws to that effect. With regard to the admiralty and mari-time jurisdiction, it would be difficult to prove that the states could resume it, if the United States should abolish the courts vested with that jurisdiction; yet, it is blended with the other cases of jurisdiction, in the second section of the third article, and ceded in the same words. But it is contended that the se-cond section of the third article contains no express cession of jurisdiction; that it only vests a power in congress to assume jurisdiction to the extent therein expressed. And under this head arose the discussion on the construction proper to be given to that ar-ticle.

On this part of the case I shall not pause long. The rules of construction, where the nature of the instrument is ascertained, are familiar to every one. To me the constitution appears, in every line of it, to be a contract, which, in legal language, may be denominated tripartite. The parties are the people, the states, and the United States. It is returning in a circle to contend, that it professes to be the exclu-sive act of the people, for what have the people done but to form this compact? That the states are re-cognised as parties to it is evident from various pas-sages, and particularly that in which the United States guaranty to each state a republican form of government.

The security and happiness of the whole was the object, and, to prevent dissertion and collision, each surrendered those powers which might make them dangerous to each other. Well aware of the sensi-

tive irritability of sovereign states, where their wills or interests clash, they placed themselves, with regard to each other, on the footing of sovereigns upon the ocean; where power is mutually conceded to act upon the individual, but the national vessel must remain unviolated. And to remove all ground for jealousy and complaint, they relinquish the privilege of being any longer the exclusive arbiters of their own justice, where the rights of others come in question, or the great interests of the whole may be affected by those feelings, partialities, or prejudices, which they meant to put down for ever.

Nor shall I enter into a minute discussion on the meaning of the language of this section. I have seldom found much good result from hypercritical severity, in examining the distinct force of words. Language *is* essentially defective in precision; more so than those are aware of who are not in the habit of subjecting it to philological analysis. In the case before us, for instance, a rigid construction might be made, which would annihilate the powers intended to be ceded. The words are, " shall extend to;" now that which *extends to*, does not necessarily *include in*, so that the circle may enlarge until it reaches the objects that limit it, and yet not take them in. But the plain and obvious sense and meaning of the word *shall*, in this sentence, is in the future sense, and has nothing imperative in it. The language of the framers of the constitution is, " We are about forming a general government—when that government is formed, its powers shall extend," &c. I therefore see nothing imperative in this clause, and certainly

it would have been very unnecessary to use the
word in that sense; for, as there was no controlling power constituted, it would only, if used in an
imperative sense, have imposed a moral obligation to
act. But the same result arises from using it in a
future sense, and the constitution everywhere assumes, as a postulate, that wherever power is given
it will be used or at least used, as far as the interests of the American people require it, if not from
the natural proneness of man to the exercise of
power, at least from a sense of duty, and the obligation of an oath.

Nor can I see any difference in the effect of the
words used in this section, as to the scope of the jurisdiction of the United States' courts over the cases
of the first and second description, comprised in that
section. " Shall extend to controversies," appears
to me as comprehensive in effect, as " shall extend
to all cases." For, if the judicial power extend " to
controversies between citizen and alien," &c., to
what controversies of that description does it not extend? If no case can be pointed out which is excepted, it then extends to *all controversies.*

But I will assume the construction as a sound one,
that the cession of power to the general government, means no more than that they may assume
the exercise of it whenever they think it advisable.
It is clear that congress have hitherto acted under
that impression, and my own opinion is in favour of
its correctness. But does it not then follow that
the jurisdiction of the state court, within the range
ceded to the general government, is permitted, and

may be withdrawn whenever congress think proper to do so? As it is a principle that every one may renounce a right introduced for his benefit, we will admit that as congress have not assumed such jurisdiction, the state courts may, constitutionally, exercise jurisdiction in such cases. Yet, surely, the general power to withdraw the exercise of it, includes in it the right to modify, limit, and restrain that exercise. " This is my domain, put not your foot upon it, if you do, you are subject to my laws, I have a right to exclude you altogether; I have, then, a right to prescribe the terms of your admission to a participation. As long as you conform to my laws, participate in peace, but I reserve to myself the right of judging how far your acts are conformable to my laws." Analogy, then, to the ordinary exercise of sovereign authority, would sustain the exercise of this controlling or revising power.

But it is argued that a power to assume jurisdiction to the constitutional extent, does not necessarily carry with it a right to exercise appellate power over the state tribunals.

This is a momentous question, and one on which I shall reserve myself uncommitted for each particular case as it shall occur. It is enough, at present, to have shown that congress has not asserted, and this court has not attempted, to exercise that kind of authority in *personam* over the state courts which would place them in the relation of an inferior responsible body *without their own acquiescence.* And I have too much confidence in the state tribunals to believe that a case ever will occur in which it will be necessary

for the general government to assume a controlling power over these tribunals. But is it difficult to suppose a case which will call loudly for some remedy or restraint? Suppose a foreign minister, or an officer, acting regularly under authority from the United States, seized to-day, tried to-morrow, and hurried the next day to execution. Such cases may occur, and have occurred, in other countries. The angry vindictive passions of men have too often made their way into judicial tribunals, and we cannot hope for ever to escape their baleful influence. In the case supposed, there ought to be a power somewhere to restrain or punish, or the union must be dissolved. At present the uncontrollable exercise of criminal jurisdiction is most securely confided to the state tribunals. The courts of the United States are vested with no power to scrutinize into the proceedings of the state courts in criminal cases; on the contrary, the general government has, in more than one instance, exhibited their confidence, by a wish to vest them with the execution of their own penal law. And extreme, indeed, I flatter myself, must be the case in which the general government could ever be induced to assert this right. If ever such a case should occur, it will be time enough to decide upon their constitutional power to do so.

But we know that by the 3d article of the constitution, judicial power, to a certain extent, is vested in the general government, and that by the same instrument, power is given to pass all laws necessary to carry into effect the provisions of the constitution. At present it is only necessary to vindicate the

1816.

Martin
v.
Hunter's
Lessee.

laws which they have passed affecting civil cases pending in state tribunals.

In legislating on this subject, congress, in the true spirit of the constitution, have proposed to secure to every one the full benefit of the constitution, without forcing any one necessarily into the courts of the United States. With this view, in one class of cases, they have not taken away absolutely from the state courts all the cases to which their judicial power extends, but left it to the plaintiff to bring his action there, originally, if he choose, or to the defendant to force the plaintiff into the courts of the United States where they have jurisdiction, and the former has instituted his suit in the state courts. In this case they have not made it legal for the defendant to plead to the jurisdiction; the effect of which would be to put an end to the plaintiff's suit, and oblige him, probably at great risk or expense, to institute a new action; but the act has given him a right to obtain an order for a removal, on a petition to the state court, upon which the cause, with all its existing advantages, is transferred to the circuit court of the United States. This, I presume, can be subject to no objection; as the legislature has an unquestionable right to make the ground of removal a ground of plea to the jurisdiction, and the court must then do no more than it is now called upon to do, to wit, give an order or a judgment, or call it what we will, in favour of that defendant. And so far from asserting the inferiority of the state tribunal, this act is rather that of a superior, inasmuch as the circuit court of the United States becomes bound,

by that order, to take jurisdiction of the case. This method, so much more unlikely to affect official delicacy than that which is resorted to in the other class of cases, might, perhaps, have been more happily applied to all the cases which the legislature thought it advisable to remove from the state courts. But the other class of cases, in which the present is included, was proposed to be provided for in a different manner. And here, again, the legislature of the union evince their confidence in the state tribunals; for they do not attempt to give original cognizance to their own circuit courts of such cases, or to remove them by petition and order; but still believing that their decisions will be generally satisfactory, a writ of error is not given immediately as a question within the jurisdiction of the United States shall occur, but only in case the decision shall finally, in the court of the last resort, be against the title set up under the constitution, treaty, &c.

In this act I can see nothing which amounts to an assertion of the inferiority or dependence of the state tribunals. The presiding judge of the state court is himself authorized to issue the writ of error, if he will; and thus give jurisdiction to the supreme court: and if he thinks proper to decline it, no compulsory process is provided by law to oblige him. The party who imagines himself aggrieved is then at liberty to apply to a judge of the United States, who issues the writ of error, which (whatever the form) is, in substance, no more than a mode of compelling the opposite party to appear before this court, and maintain the legality of his judgment obtained before the

state tribunal. An exemplification of a record is the common property of every one who chooses to apply and pay for it, and thus the case and the parties are brought before us; and so far is the court itself from being brought under the revising power of this court, that nothing but the case, as presented by the record and pleadings of the parties, is considered, and the opinions of the court are never resorted to unless for the purpose of assisting this court in forming their own opinions.

The absolute necessity that there was for congress to exercise something of a revising power over cases and parties in the state courts, will appear from this consideration.

Suppose the whole extent of the judicial power of the United States vested in their own courts, yet such a provision would not answer all the ends of the constitution, for two reasons:

1st. Although the plaintiff may, in such case, have the full benefit of the constitution extended to him, yet the defendant would not; as the plaintiff might force him into the court of the state at his election.

2dly. Supposing it possible so to legislate as to give the courts of the United States original jurisdiction in all cases arising under the constitution, laws, &c., in the words of the 2d section of the 3d article, (a point on which I have some doubt, and which in time might, perhaps, under some *quo minus* fiction, or a willing construction, greatly accumulate the jurisdiction of those courts,) yet a very large class of cases would remain unprovided for. Incidental questions would often arise, and as a court of competent

1816.

Martin
v.
Hunter's
Lessee.

jurisdiction in the principal case must decide all such questions, whatever laws they arise under, endless might be the diversity of decisions throughout the union upon the constitution, treaties, and laws, of the United States; a subject on which the tran-quillity of the union, internally and externally, may materially depend.

I should feel the more hesitation in adopting the opinions which I express in this case, were I not firmly convinced that they are practical, and may be acted upon without compromitting the harmony of the union, or bringing humility upon the state tribunals. God forbid that the judicial power in these states should ever, for a moment, even in its humblest departments, feel a doubt of its own independence. Whilst adjudicating on a subject which the laws of the country assign finally to the revising power of another tribunal, it can feel no such doubt. An anxiety to do justice is ever relieved by the knowledge that what we do is not final between the parties. And no sense of dependence can be felt from the knowledge that the parties, not the court, may be summoned before another tribunal. With this view, by means of laws, avoiding judgments obtained in the state courts in cases over which congress has constitutionally assumed jurisdiction, and inflicting penalties on parties who shall contumaciously persist in infringing the constitutional rights of others—under a liberal extension of the writ of injunction and the *habeas corpus ad subjiciendum*, I flatter myself that the full extent of the constitutional revising power may be secured to the United States, and the

benefits of it to the individual, without ever resorting to compulsory or restrictive process upon the state tribunals; a right which, I repeat again, congress has not asserted, nor has this court asserted, nor does there appear any necessity for asserting.

The remaining points in the case being mere questions of practice, I shall make no remarks upon them.

Judgment affirmed.