Bronson, J.
It is rarely, if ever, too late to object to the jurisdiction of a court, where the defect of power to hear and determine appears on the face of the proceedings. And although the question of jurisdiction was not made before the chancellor, it may, I think, be started here for the first time, where, as in this case, the objection, if valid, *162 is of such a character that it could not have been obviated by an amendment had it been made at an earlier stage in the proceedings.
Two objections are urged going to the power of the court of chancery to take cognizance of the cause. It is said, 1. That at the common law a state cannot sue; and 2. That it cannot sue in the courts of another state.
Whatever difficulty there may be when a foreign government comes into our courts,(a) I cannot entertain a doubt that one of the states of this union may sue in its political or corporate capacity. In that capacity it may contract and acquire rights; and there can be no reason why, like every other legal being, it should not be allowed to sue for the redress of wrongs. It is matter of every day observation that such suits have been brought and maintained; and I am not aware that any one has ever thought before of making a question about it. I see no difference whether the state sues in its own courts or in those of another jurisdiction. Although the right of the people of this state to sue is recognized by the laws, there is, I believe, no direct provision that such suits may be maintained. The right depends on the general principle that every person, whether natural or .artifical, capable of making a contract or suffering a wrong, may have an action to enforce the one, and to redress the other.
This is a suit by a state against a citizen of another state; and the appellant insists that the suit might have been brought in the supreme court of the United States, and that the jurisdiction of that court in cases of this character is exclusive. [Canst. U. S., Art. 3, § 1, 2.) If this argument is well founded, the court of chancery had no jurisdiction, and the decree is either utterly void, or should be reversed for error.
Prior to the adoption of the federal constitution a state might sue, but could not be sued; and there may be some reason for supposing that states were mentioned in the ar *163 tide relating to the judicial power of the United States, for the purpose of providing a forum in which they might be impleaded as defendants ; and that the jurisdiction of the federal courts does not extend to cases in which the suit is prosecuted by a state, except in the single case where the parties on both sides are states. But it is unnecessary to consider that question.
Assuming that the counsel were right in saying that the suit might have been brought in the supreme court of the United States, the question then is whether the jurisdiction of that court is exclusive ; or whether the state courts may exercise concurrent powers. The thirteenth section of the judiciary act of 1789 provides, “ that the supreme court shall have exclusive jurisdiction of all controversies of a civil nature where a state is a party, except between a state and its citizens; and except also, between a state and citizens of other states or aliens, in which latter case it shall have original, but not exclusive jurisdiction.” (2 Laws U. iS. 62, Bio. ed.) Thus it will be seen that congress has decided the question against the appellant. Indeed, the whole act was framed upon the principle that the federal constitution had not, by its own force, divested the state courts of any portion of their former jurisdiction; and the counsel were obliged to contend that congress had exceeded its powers in asserting that principle. Let us then see whether any thing can be gained by this appeal from congress to the fundamental law of the union.
On looking at the third article of the constitution it will be seen, that the first section declares in what courts the judicial power of the United States shall be vested, without defining the limits of the power. It “ shall be vested in one supreme court, and in such inferior courts as the congress may, from time to time, ordain and establish.” The first clause of the second section declares the extent of the judicial power: and the second clause prescribes the form, whether original or appellate, in which the supreme court shall exercise its jurisdiction. The latter clause confers no new powers; but only specifies the manner in which the powers already granted should be exercised so far as *164 the supreme court was concerned. The words are—“ in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the supreme court shall have original jurisdiction. In all the other cases before mentioned, the supreme court shall have appellate jurisdiction.” The preceding clause had specially enumerated all -the cases to which the judicial power should extend. A part, of those cases are again mentioned in the second clause—not for the purpose of making a new grant—but for the purpose of defining the boundary between the original, and the appellate jurisdiction of the supreme court. The words, “in all the other cases before mentioned,” plainly show that the convention was speaking in the second clause of those cases, and those only, to which the judicial power had been extended by the first clause. That power could not be enlarged by a mere declaration prescribing the form, original and appellate, in which it should be exerted.
We must then look to the first clause alone for the purpose of ascertaining the boundary of this power. That clause declares-that “ the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls ; to all cases of admiralty and maritime jurisdiction ; to controversies to which the United States shall be a party; to controversies between two or more states, between a state and citizens of another state, between citizens of different states, between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.” There are no words of exclusion in the clause, nor any thing to indicate the intention of the framers of the constitution to oust the state courts from the exercise of concurrent jurisdiction in the specified cases.
There is nothing in the nature of jurisdiction, as applied to courts, which renders it exclusive. It is not like a grant of property, which cannot have several owners at the same *165 time. It is matter of common experience that two or more courts may have concurrent powers over the same parties and the same subject matter. Jurisdiction is not a right or a privilege belonging to the judge; but an authority or power to do justice in a given case when it is brought before him. There is, I think, no instance in the whole history of the law where the mere grant of jurisdiction to a particular court, without any words of exclusion, has been held to oust any other court of the powers which it before possessed. Creating a new forum with • concurrent jurisdiction may have the effect of withdrawing from the courts which before existed a portion of the causes which would otherwise have been brought before them; but it cannot affect the power of the old courts to administer j.ustice when it is demanded at their hands.
Although the matter is plain enough upon principle, it may be proper to notice some of the consequences which must follow, should the doctrine for which the appellant contends be adopted. And in the first place, a large portion of the judicial power of the United States, as it is declared by the constitution, has never been vested in any of the federal courts by the legislation of congress. The truth of this remark will be sufficiently manifest on comparing the judiciary act with the possible extent of the judicial power, without stopping at this time to point out the particular casés to which the remark applies. If, then, the jurisdiction of the federal courts is made exclusive by the constitution, proprio vigore, it ‘follows as a necessary consequence that there are many cases of which no court whatever can take cognizance, and thus there may be an entire failure of justice.
Again: If this doctrine of exclusive jurisdiction in the federal courts has any foundation, the state courts have been wrong ever since the adoption of the constitution; and scarcely a term has been held when those courts have not rendered one or more judgments which were absolutely void. There are several classes of cases where, although the federal courts have jurisdiction, the state courts have *166 constantly exercised concurrent powers ; and their right to do so has never been seriously questioned. The following cases may be mentioned: 1. Where the United States sue. 2. Where a state sues a citizen of another state. 3. Where it sues an alien. 4. Where a citizen of one state sues a citizen of another state. 5. Where a citizen sues an alien. 6. Where an alien sues a citizen. These are cases where the jurisdiction of the federal courts depends on the character of the party. But the state courts have also exercised concurrent powers in cases where the jurisdiction of the federal courts depends on the nature of the cause..
The appellant’s counsel felt that the argument for exclusive cognizance was beset with difficulty on account of the extent of its influence ; and they proposed to limit it to cases where the supreme court has original jurisdiction ; and finally, to the single case of a suit in which a state is a party. But there is nothing in the constitution which makes the jurisdiction of the federal courts any more exclusive in one case than it is in another. It is either exclusive in all cases to which the judicial power extends, or it is exclusive in none. The words—“ the judicial power shall extend to”-—apply alike and with equal force to all the cases enumerated in the clause; and upon no just principle'of interpretation can they be made to act with greater efficiency upon one case than they do upon another. ' If there be any possible ground for a distinction, it must be in those cases which, in the enumeration, are preceded by the word “ alland that will not include the case of a suit to which a state is a party, for the word “ all” is dropped before we get so far. In Martin v. Hunter's lessee, (1 Wheat. 333 to 336,) Mr. Justice Story suggested that this word “ all” might, perhaps, affect the question of exclusive jurisdiction. So far as his remarks go, they tend to the conclusion that in the case of a state, the jurisdiction of the federal courts is not exclusive, although it may be so in some other cases. But I place no reliance on this distinction. It is one on which the supreme court of the United States has never acted, as it has never held that the consti *167 tution made any portion of the judicial power exclusive. Should the court ever find it necessary to consider that question, they will not, I think, follow the suggestion thrown out by Mr. Justice Story. If the convention intended to make any portion of the judicial power exclusive, it is difficult to suppose that they would have excepted from that list “ controversies to which the United States shall be a party,” “controversies between two or more states,” and “ between a state and foreign states.” And yet, such consequences will follow should the question be made to turn on the word “all” in the preceding part of the clause. And besides, where there are no qualifying words, a declaration that the judicial power shall extend to particular cases, is just as potent as a declaration that it shall extend to all of those cases. If the whole are not included in hath instances, how shall it be determined which are excluded ? I am not aware of any rule of interpretation which will enable us to answer that question. If the whole are included in both instances, then it seems to follow that the jurisdiction is either exclusive in all the cases, or in none of them. I have already assigned the reason for adopting the latter conclusion. As a grant of jurisdiction is not in its own nature exclusive, it can only be made so either by express words, or by necessary implication ; and here we have neither.
I understood it to be conceded on the argument that ambassadors, other public ministers and conusls, might sue in the state courts. If this be so, why may not a state sue in those courts ? No satisfactory answer to that question has occurred to my mind. The judicial power of the United States extends alike to all of those cases; and in relation to all, original jurisdiction is given to the supreme court by the same clause and in the very same words.
The judicial power of the United States extends to criminal, as well as civil cases; and if the argument for exclusive jurisdiction be well founded, it follows as a necessary consequence that an alien or a citizen of another state who comes here and commits a crime cannot be indicted in our courts, *168 because the state is a party. The criminal will either go free altogether, or else he must be prosecuted in the supreme court of the United States—that being the only federal court which can exercise original jurisdiction where a state is a party. Probably no one is prepared to carry the doctrine of exclusive jurisdiction so far; and yet such are its legitimate consequences. There is no middle ground.
The appellant’s counsel may be right in saying, that where the supreme court of the United States has original, it cannot exercise appellate jurisdiction, unless the case be such that jurisdiction may depend on the nature of the cause as well as the character of the party. See on this subject, Marbury v. Madison, (1 Cranch, 173 ;) Cohens v. Virginia. (6 Wheat. 399, also, p. 397, 8;) Osborn v. U. S. Bank, (9 Wheat. 820;) Davis v. Packard, (7 Peters, 276, and 8 Peters, 312, S. C.) The appellant may therefore be entitled to the benefit of the argument, that whichever way this cause may be decided there will be no appeal to the supreme court of the United States. But that does not prove that the judicial power of the United States is exclusive. It only proves that the federal courts may fail to get actual cognizance of a case which they might have heard and determined if the party had chosen to go there. This is nothing more than what happens every day and in all the states of the union; and it has been so qver since the adoption of the constitution. If we first subtract cases of admiralty and maritime jurisdiction, and those arising under the revenue, patent and post-office laws, I think that not so much as one case in one hundred of those which remain, and which might be brought in the federal courts, ever find their way into that jurisdiction. Parties often find it more convenient, and, perhaps, equally safe to resort to the state courts.
It has, I know, been suggested that' the plaintiff has not a right to elect his forum where he might sue in the federal courts. (Martin v. Hunter's lessee, 1 Wheat. 348.) But there has been no such decision, and I do not think it probable that the point will ever be so settled.
*169 I have discussed this question upon the constitution alone, because the appellant’s counsel appealed from the decision of congress to the fundamental law. In denying that the constitution has made the jurisdiction of the federal courts exclusive, I must not be understood as affirming that the state courts have concurrent powers in all cases of federal cognizance. Where a state is made defendant, the state courts cannot exercise jurisdiction. But this is not because the constitution has forbidden it; but because a sovereign state- is only suable by virtue of the express compact to submit itself to the federal courts. Again : • crimes are only punishable by the government against which they are committed, and the state courts will not enforce the penal laws of the United States, or of'any other state. This rests on a general principle wholly independent of the federal constitution. (The United States v. Lathrop, 17 John. R. 4. Scoville v. Canfield, 14 John. 338. Story on Confi. Of Laws, 516, 2d ed., and cases cited.) There are some cases where congress has declared the jurisdiction of the federal courts exclusive. But they are cases which are peculiar to, and spring out of the very existence of the federal government; and not cases of which the state courts had cognizance prior to the adoption of the constitution. A distinction of this kind was taken by Mr. Hamilton in the 82d number of the Federqlist, and has been recognized since that time. (Martin v. Hunter's lessee, 1 Wheat. 334—7. The United States v. Lathrop, 17 John. R. 4. 1 Kent, 395, htli ed.) And see Cohens v. Virginia, (6 Wheat. 418,) where Chief Justice Marshall tells us that the Federalist is a work of great authority, and cites a part of the number to which I have referred. Although the constitution does not make the jurisdiction of the federal courts exclusive in any case, it may be that congress can exclude the state courts in the cases to which I have alluded. But that is a' question which need not now be considered. I feel no disposition to claim any thing for the states which may tend to defeat the successful operation of the general government at home, or to embarrass it in our relations with foreign powers. Entertaining this suit can *170 have, no such-effect. It does not relate to any subject of federal cognizance; and although from the character of the party, the supreme court of the United States might exercise'jurisdiction, we have already seen that congress has left a concurrent power with the state courts.
Before dismissing this question, I must" take some further notice of how it stands upon authority. The numbers of the Federalist were published while the constitution was before the people of the several states for adoption. In the number already cited, Mr. Hamilton plainly lays down the doctrine that the state courts would retain concurrent jurisdiction in those cases of which they previously had cognizance. He rejects the opposite construction, because it “ would amount to an alienation of state power by implication.” This construction was before the people when they gave their assent to the new frame of government. The first congress, which assembled in 1789, substantially ratified and confirmed this construction by the act “ to establish the judicial courts of the United States.” (2 Laws U. States, 56, Bio. ed.) In The United States v. Ravara, (2 Dallas, 297,) the defendant, who was consul from Genoa, was indicted for a misdemeanor in the circuit court of the United States for the Pennsylvania district; and the same objection was taken there that is taken here; to wit, that it was a case in which original jurisdiction had been given to the supreme court of the United States by the constitution, and that no other court could take cognizance of the cause. But the objection was overruled by Wilson, J. and Peters, J. against the opinion of Judge Iredell; and a motion to quash the indictment was denied. The defendant was afterwards tried and convicted in the circuit court, before Chief Justice Jay and Judge Peters. (Id. p. 399, note.) In Commonwealth v. Kosloff, (5 Serg. <$f Rawle, 545,) an indictment which had been found against the consul general of Russia for rape, was quashed by the supreme court of Pennsylvania. But the decision was put mainly on the ground that congress had made the jurisdiction of the federal courts exclusive in a case of that *171 character, which is not pretended in relation to the case before us. In the manuscript case of Dunham v. Gordon, cited in Coxe's Dig. p. 433, it is said to have been decided, that the circuit court of the United States has no jurisdiction of a cause in which a state is a party. That may well be, without affecting the question before us, for the circuit courts are created, and their powers defined by congress; and the eleventh section of the judiciary act has not given them jurisdiction where a state is party. In Marbury v. Madison, (1 Crunch, 174,) some dicta fell from Chief Justice Marshall, which are supposed to have a bearing upon this question; but he had occasion to qualify those remarks in Cohens v. Virginia, (6 Wheat. 399.) In United States v. Ortega, (11 Wheat. 467,) the supreme court declined expressing any opinion on the question whether their jurisdiction was exclusive of that of the circuit courts in a criminal case affecting a public minister.
From this brief review, I think it clear that the federal judiciary has never asserted any principle which forbids our taking cognizance of a cause on the ground that a state is party plaintiff or complainant; and as an original question, I am unable to entertain a doubt concerning it.
We are now brought to those questions which were made in the court of chancery, and which touch the merits of the controversy.
The contracts made by the appellant with the commissioners were not originally obligatory upon the state of Illinois, because the commissioners were not acting- within the scope of their authority. There are two difficulties in the way of maintaining the contracts: 1. The bonds were sold for less than their par value; and 2. They were sold on credit.
The bonds were not to be sold at their market value, if less than the nominal sum secured by them; nor were they to be sold with any reference to the legal rate of interest in the place where they might be negotiated. They were six per cent., bonds in all markets; and the commissioners *172 were forbidden by their power—the statutes of Illinois— to sell at less than par value. This can, I think, mean nothing else than pound for pound, or dollar for dollar. Mr. Webster, by way of illustrating the meaning of the word par, tells us that “ bills of exchange are at par, above par, or below par. Bills are at par when they are sold at their nominal amount for coin or its equivalent.” This is not a question about the par of exchange, and we need not trouble ourselves with an investigation of the laws which govern exchanges. It is a question about par value; and if that does not mean in this case a dollar in money for every dollar of security, the wit of man cannot tell us what it does mean.
The appellant seems to have understood this question as I do, for he tells us in his affidavit that “ the commissioners treated and considered the said contract and sale of the said bonds at par, receiving a dollar of legal currency for every dollar of bonds sold.” But the difficulty is, that the bonds were on interest long before the money was to be paid. The par value of a bond is the sum due on it, and not the sum originally secured by it.
In answer to this difficulty, the appellant tells us, that between Illinois and New-York, exchanges were five per cent, in favor of the latter. And further, he did better by the state than he would if he had charged himself with interest and made his payments for the bonds in Illinois, inasmuch as he could have bought the notes of the state bank at from five to sixteen per cent, discount. Now, I am unable to see what the rate of exchange between Illinois and New-York has to do with the matter. The bonds were negotiated in New-York, and there they were to be paid both principal and interest. The money was to be loaned in New-York, and the agents of the state were there ready to receive it. The appellant deceives himself if he supposes that exchange had anything whatever to do with such a transaction. If he had agreed to pay the money in Illi- ' nais or London, a question of exchange. might have arisen: *173 and perhaps the same question might have been made if the bonds had been payable at another place from that where the loan was made. But it is idle to talk about exchanges when the money is borrowed, received: and made payable all in the same place.
The suggestion about paying in a depreciated paper currency, is, if possible, still worse than the claim to charge exchange. This was a negotiation for a loan of money. I will not at this day and in this state discuss the question whether bank bills which will bring only eighty-four cents on the dollar are to be regarded as money.
There is no good answer to the objection that the bonds were sold below their par value.
The sale was also on credit. This is not denied; but it is said that an agent or factor may sell on credit without a special authority to do so. That is undoubtedly true in certain cases. But can he sell public or other stocks, such as are usually sold in the stock market, on credit?' I am not aware of any law, or usage of trade, which will sanction such a sale by ah agent without a special authority from the principal.
.But here, again, we are drawn into the discussion of a question which, in my judgment, is quite wide of the mark. "What was the nature of the business which "the agents were authorized to transact? They were to negotiate a loan of money. The state proposed to borrow money, not to lend its bonds: and if the appellant intended to meet the proposition, his business was to lend money, not to borrow bonds. And yet, in effect, the negotiation ended in a loan of bonds to the appellant, in two parcels, to the amount of $583,000, on his agreement to pay the money at a future day. Of this sum, the state, has received only $170,000; and the balance of $413,000, to which interest must be added, remains, and may forever remain, unpaid. The very best that can be said of the transaction is, that the agents exchanged the credit of the state for the credit of the appellant. There is no foundation for saying the commission *174 ers were acting within, the scope of their authority. The thing is preposterous.
True, the commissioners were authorized to contract for a loan payable in instalments of $100,000 each; but that did not warrant them in delivering bonds before they got the money. It was quite easy to deliver a hundred bonds as often as an instalment was paid; and if they had pursued their power and made a contract to deliver bonds on receiving the money the state could not have suffered.
The appellant knew he was dealing with special agents, and was bound to know the extent of their authority. Indeed, it is not denied that he knew all about it. The bill charges that he was fully advised of all the acts and statutes under which the commissioners acted; and this is virtually admitted by the appellant in his affidavit. But he says, “he entered into said contracts in good faith, and in the full belief that the same contracts were within the letter and the spirit of the law.” Now, “good faith” and “belief” will not help the matter, if the agents acted without authority. But what does the appellant mean by “ good faith ?” These words have come to strange uses within the last few years. He should have given the facts, and then left to the courts to judge whether he contracted in “good faith.” His “belief” is very remarkable. According to his own account of the matter, he took bonds drawing interest at the rate of six per cent, while the average of payments to be made by him was six months, so that the state would lose three per cent. But this, he thinks, was not only made up, but that the state actually got a- premium of two per cent, because exchange was five per cent, against Illinois and in favor of New-York. Now, here was a loan in New-York, the money was to be repaid in New-York, and yet the lender believes he had a right to charge exchange because the borrower was not at home when he got the money. Such “ belief” as this belongs to modern times. The thing would not have been believed, or even thought of, ten years ago. Again : the commissioners were sent out to borrow money, but instead of do *175 ing that, they loaned the state bonds; and the appellant believes this was “within the letter and the spirit of the law.” I know that money lenders are often credulous about their right to make a good bargain; but in matters of this kind they must believe at their peril. Their credulity cannot alter the law.
We are now brought to the enquiry whether the contracts have been ratified, so as to be obligatory upon the state of Illinois. I felt some difficulty upon this question on the argument; but after reflecting upon it I am unable to say that there has been a ratification. The appellant relies on the fact that the governor, after he knew of the first contract, signed the bonds and caused them to be delivered ; and that some of the other public officers of the state acted under the contracts, drawing for money and receiving payments. But the difficulty is, that the governor was no more than an agent for the state, and he, as well as the commissioners, acted under a limited authority; and the same remark is applicable to the auditor and other public officers. None of them had authority to make such contracts as these were; and if they could not make them originally, they could not ratify them. Ratification must come from the principal—the state of Illinois. (The People v. Phœnix Bank, 24 Wend. 431.)
What has the state done by way of sanctioning the contracts ? The answer is, nothing. The legislature has neither declared the contracts valid, nor done any act in affirmance of them. But it is said, that long acquiescence, or even mere silence, may sometimes amount to a presumptive ratification of the acts of an agent; and that is undoubtedly true. (Story on Agency, 248, 250.) 2 Kent, 614.) But before we infer any thing from the mere silence of the principal, we must look into the nature of the original transaction, the relations between the parties, their habits of business, and the usages of trade. Under particular circumstances, the silence of the principal for a very few days after he is advised of an act done by his *176 agent, may amount to strong presumptive evidence of ratification ; especially where such silence has a tendency to mislead the opposite party. But it will never do to apply so rigorous a rule where a state is the principal. I agree, that when a state engages in trade or makes contracts, it must, for most purposes, be regarded in the same light as an individual. (United States Bank v. Planter’s Bank, 9 Wheat. 904.) But a state cannot act in the same form, nor with the same promptitude as an individual. The legislature does not usually assemble more than once in a year; and when assembled, time must be given for maturing public acts. The appellant knew the character of the party with whom he" was dealing; and he had no right to expect that the state would move with the celerity of a merchant in Pearl, or a broker in Wall-street.
Now, what was done in this case? One of the contracts was made in April, and the other in May, 1839; and the legislature did not assemble until the winter following. There was nothing in the meantime which could, upon any just principle be construed Into a ratification of the contracts. On the 20th January, 1840, the joint committee of the two houses, to whom the subject had been referred, reported a resolution repudiating the contracts, which soon afterwards passed the senate. But more moderate councils finally prevailed, and the vote of the senate was reconsidered. On. the first of February, an act was passed to abolish the board of fund commissioners; and another act providing: for a single commissioner. Under this act, Mr. Barrett was appointed; and about the middle of April following, he was in New-York endeavoring to get back the bonds. The negotiation between the commissioner and the appellant continued until the bill was filed in August following. There is nothing here from which a ratification can be reasonably -presumed. The most that can be said is, that the state, instead of adopting the arbitrary course of sitting as judge in its own cause, and declaring the contracts void, has thought proper to apply, first to the appel *177 lant, and then to a»court of justice for redress. The state is neither worthy of censure, nor has it lost any right, by omitting a formal repudiation of the contracts, and appealing to an impartial arbiter to say whether they were valid or not. The appellant has not been misled, either by silence or any thing else, into the belief that the legislature intended to ratify the contracts. He has lost nothing by the delay, for he still holds both the bonds and the money.
The next objection on the part of the appellant is, that the state had an adequate remedy at law, and that a court of equity cannot grant the relief which is asked. So far as the bill goes for a discovery there can be no room for making a question. But it prays an injunction to restrain the negotiation of the securities, and a receiver to take possession of the bonds, and the proceeds of such of them as may have been sold. If I am not mistaken in what has been said under the last two heads of discussion, the appellant got these bonds into his possession under a contract which is absolutely void. He never had any legal title to the securities. The bonds are negotiable instruments, the title to which will pass by mere delivery; and although void in the hands of the appellant, they will be valid securities in the hands of a bona fide holder. The appellant is not of sufficient responsibility to answer for the value of the bonds; and the state will suffer irreparable injury if he is allowed to transfer them. In such a case I take it to be settled, that a court of equity may interfere by injunction and restrain the negotiation of the securities. (Patrick v. Harrison, 3 Pro. Ch. R. 476. Lloyd v. Gurdon, 2 Swanst. 180. Hood v. Aston, 1 Russ. 412. Osborn v. U. S. Bank, 9 Wheat. 738. 2 Story’s Eq. 9—12. And see Hamilton v. Cummins, 1 John. Ch. R. 517; Chechworth v. Edwards, 8 Ves. 46.) If the chancellor was right, as I think he was, in ordering an injunction, it was of course proper to appoint a receiver to take possession of such of. the bonds as may still be in the appellant’s hands or within his reach, and of the proceeds of such as may have been *178 transferred. In this way the fund, so far as it .can now he traced, will be preserved until the cause comes to a hearing and final decree.
One or two questions of minor importance still remain to be noticed.
It is objected that the whole equity of the bill is answered by the appellant’s affidavit, showing, as is said, that all the bonds had been transferred before the bill was filed. The bill was filed on the 10th August, 1840, and on that day a copy was served on the appellant, with notice of motion for an injunction to be made on the 18th day of that month. The appellant’s affidavit was made on the 17th day of August, just one week after he had been served with a copy of the bill. All that the affidavit says on this subject is contained in the following clause: “ And this deponent further states, that none of said bonds are now in his possession, or under his control, having all been bona fide disposed of by him in the course of his business.” It is quite obvious that the appellant did not mean to deny that he had all, or, at least, some portion of the bonds in his hands at the time he was served with the bill. And it is equally obvious that he did not mean to say, that the bonds had been actually sold and transferred. All that he has said may be literally true, although the bonds were hypothecated by him after the bill was filed, and for no more than ten dollars. The affidavit contains nothing like a sufficient answer to the prayer for an injunction. I may add, that if the bonds have actually been sold and transferred to bona fide holders, the injunction will do the appellant no great harm.
The appellant complains that he has suffered great wrong at the hands of the respondent. Upon this little need be said. If he has any just claims upon the state growing out of this transaction, it is not to be doubted that the court of chancery will do justice to him as well as the opposite party when the facts have all been ascertained, and the cause comes to a final hearing. As he has had bonds to *179 more than four hundred thousand dollars beyond his payments, it is not very probable that the wrongs of which he complains will make a balance in his favor.
I have been unable to discover any error in the order appealed from, and shall vote for its affirmance.
Verplanck, senator, also delivered a written opinion in favor of affirming the order appealed from.
All the members of the court save two, twenty being present, concurring in this result, the order of the chancellor was accordingly AFFIRMED.
*181 C A S JE S ARGUED AND DETERMINED IN THE ® W 3P IB 311 3SS II © © W 3B l01 OP THE STATE OF NEW-YORK, IN JANUARY TERM, 1842.

(a) See The Columbian Government v. Rothschild, (1 Sim. Rep. 94.)