In the matter of Wm. Ramsden, &c.

---

## SUPERIOR COURT.

In the matter of the application of WILLIAM RAMSDEN, to be made a naturalized citizen of the United States.

The *power* conferred by the constitution of the United States upon *congress* to establish a rule of *naturalization*, is of that class which leaves authority in the states, until congress *exercises* the delegated right. And when so exercised, the *act of congress becomes necessarily exclusive* over the whole subject—that is, a power exclusively to constitute citizens—not merely a power to prescribe *how* the states shall do so. It involves the whole power of effecting the object as well as all details of its exercise. (*This is adverse to the case of ex parte Knowles, decided by the supreme court of California. Am. Law Reg. for Aug.* 1856.)

In 1802, a new statute was passed by congress upon the subject of naturalization, repealing the former statute. It contains the following clause :—

In the matter of Wm. Ramsden, &c.

"Whereas, doubts have arisen whether certain courts of record in some of the states are included within the description of district or circuit courts—Be it enacted, that every court of record, in any particular state, having common-law jurisdiction, and a seal, or clerk, or prothonotary, shall be considered as a district court, within the meaning of this act."

Although the several statutes of the *states*, passed from time to time, regulating the fees of the clerks of the courts in reference to naturalization—prohibiting courts from naturalizing on certain days, &c.,—cannot be considered as conferring a *power to naturalize*, which the state legislatures are incompetent, even by the most explicit words, to bestow, yet they operate in this manner :—

The power of legislation upon this subject existed in the states prior to the constitution : The legislation would have been executed in the ordinary tribunals of justice : The power has been superseded by an act of congress passed under the constitution : Congress adopted the state tribunals as the agents to exercise the power, as they would have performed it before : The concurrence of the state legislatures, expressed or fairly implied, adds the sanction of the state to this delegation of power.

Whether such tribunals are bound to act may admit of controversy. That their acts are lawful, if they do so, seems undeniable. (*The California case, supra, holds, that the power to naturalize, conferred by the act of* 1802, *was a judicial power ; that congress had no authority to confer jurisdiction upon the courts of the states ; that the states had originally the power to naturalize ; that the provision of the constitution, giving power to congress to establish a uniform rule of naturalization, did not exclude the states from naturalizing, although they must follow, in doing so, any rule prescribed by congress ; that the power is not given to congress at all, but only the power to direct the states in what manner and according to what rules they shall naturalize.*)

*New-York Special Term, Jan.,* 1857.

Hoffman, Justice. I have been in the habit of exercising the power of naturalizing conferred by the act of congress of 1802, in common with most of the judges, and without a minute examination of my authority or duty. But a decision of the supreme court of California lately published, (*Am. Law. Reg. for Aug.* 1856, *ex parte Knowles*,) has induced me to investigate the subject.

The court there hold—

1st. That the power to naturalize, conferred by the act of 1802, was a judicial power.

2d. That congress had no authority to confer jurisdiction upon the courts of the states ; that the constitution gives no

such power; that it expressly declares, the judicial power shall be vested in one supreme court, and in such inferior courts as the congress may, from time to time ordain and establish. (§ 1, *Art.* 3.) The constitution having thus fixed where the judicial power shall be vested, it cannot be vested elsewhere.

3d. That the states had, originally, the power to naturalize; that the provision of the constitution, giving power to congress to establish a uniform rule of naturalization, did not exclude the states from naturalizing, although they must follow, in doing so, any rule prescribed by congress. The power is not given to congress at all, but only the power to direct the states in what manner, and according to what rules, they shall naturalize.

4th. Hence the question was, whether the state of California had authorized any state tribunal to perform this act; and if so, what tribunal? And the court found such authority vested in certain courts of the state under a fee-bill of May, 1853, allowing certain fees in the process of making citizens, and directing the papers to be issued by the court.

I may observe, that if the theory of this decision was perfectly correct, there would probably be found in the provision of our own act of 1844 (*chap.* 127, § 1,) as full a power, by inference, given to courts of record in New-York, as is found in the statute of California. This act will be noticed hereafter.

But, with the utmost respect to the learned court, it appears to me there is an important error in the doctrine of the case. In the first place, I apprehend that the power conferred by the constitution is of that class which leaves authority in the states until congress exercises the delegated right; and when so exercised, the act of congress becomes necessarily exclusive. Such I understand is the received construction of the clause as to the establisment of uniform bankrupt laws. "It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states." (*Ch. J.* MARSHALL, 4 *Wheaton*, 196.)

In the next place, it appears to me that the power conferred is a power over the whole subject—a power exclusively to con-

stitute citizens—not merely a power to prescribe how the state shall do so. To establish a rule of naturalization, is to declare how aliens shall become citizens. It involves the whole power of effecting the object, as well as all details of its exercise. When, then, the people of the United States have said that congress shall have that power, and congress exercises it, the right to accomplish it in any other mode, or by any other body, is superseded.

I apprehend that the case of *Chirac* agt. *Chirac*, (2 *Wheaton*, 269,) involves this proposition. Chief Justice MARSHALL says, " The proposition that the power of naturalization is exclusively in congress, does not seem to be, and ought certainly not to be controverted." And he notices the first point of the plaintiff to be, that the estate of which J. B. Chirac died seized, was escheatable, because it was acquired before he became a citizen of the United States, the law of the state of Maryland, according to which he took the oaths of citizenship, (*Act of* 1779,) being virtually repealed by the constitution of the United States and the act of congress.

The case turned upon the effect of the treaty with France; but it appears to me that the court would otherwise have supported the point.

In the case of *Lynch* agt. *Clark*, (1 *Sand. Ch. Reports*, 584,) assistant Vice-Chancellor SANDFORD examined this and other questions connected with the subject, with great care and learning. He adverts to the case of *Collet* agt. *Collet*, (2 *Dallas*, 294,) decided, in 1792, in the circuit court of Pennsylvania, as holding that the states had still concurrent power of naturalizing; to the case of *The United States* agt. *Valletto*, (*id.* 371,) in which Judge IREDELL expressed a contrary opinion; to *Chirac* agt. *Chirac*, above cited, and adds, " The authors of the Federalist insisted, that the power to naturalize must necessarily be exclusive, else there could be no uniform rule. And it seems to be conceded on all hands that it is exclusive." He cites 1 *Kent*, 424, 2d ed.; *Davis* agt. *Hall*, 1 *Nott & M'Cord*, 292; *The State* agt. *Manuel*, 4 *Dev. & Batt.* 25.)

The assistant vice-chancellor further holds, that the power

is taken away from the states, although congress may have omitted to legislate upon the whole subject. (*Prigg* agt. *The Commonwealth of Pennsylvania*, 16 *Peters*, 617.)

But the determination of this point—the decision that the view I have suggested, not the doctrine of the learned court, is the correct theory—is very far from settling the question. Yet it is of importance that the true doctrine upon the constitutional provision should be ascertained.

The act of congress of March 26, 1790, was, I believe, the first upon the subject of naturalization; and it contained a provision that the party might be admitted, on application to any common-law court of record, in any one of the states, wherein he shall have resided for the space of one year at least.

The act of January 29, 1795, (*Vol. I*, 414,) provided, that the oath of intention should be made before the supreme, superior, or circuit court of some one of the states or territories, or a circuit or district court of the United States. The court admitting such aliens is to be satisfied of certain particulars, and proceedings are to be recorded by the clerk of the court.

In 1802 the act was revised, and a new statute was passed, repealing, indeed, the former statute. It contained the following clause :—

" Whereas, doubts have arisen whether certain courts of record in some of the states are included within the description of district or circuit courts—

" Be it enacted, that every court of record, in any particular state, having common-law jurisdiction and a seal, or clerk, or prothonotary, shall be considered as a district court, within the meaning of this act."

In *Spratt* agt. *Spratt*, (4 *Peters' U. S. Rep.* 406,) the court thus defines the nature of these statutes :—" The various acts upon the subject submit the decision on the right of aliens to admission as citizens, to courts of record. They are to receive the testimony, to compare it with the law, and to judge on both law and fact. This judgment is entered on record as the judgment of the court. It seems to us, if it be in legal form, to

close all inquiry; and, like every other judgment, to be com-
plete evidence of its own validity."

This decision defined the exercise of the power in question
to be a judicial act.

The statute of 1802 has remained in force to this day, and in
this particular without alteration. It has been acted upon, in
the state of New-York, by state tribunals, without a question,
and thousands rest their claim for the rights of citizens, and the
tenure of real estate upon its validity.

In the case of *Stark* agt. *The Chesapeake Ins. Co.*, (7 *Cranch*,
120,) the question was as to the citizenship of the plaintiff.
He produced a record of the court of common pleas of the
county of York in Pennsylvania, admitting him. The question
was whether it should appear on the record that all the pre-
requisites had been complied with. The plaintiff insisted that
the decision was conclusive. The court held that the citizen-
ship was established.

The present question, it is true, was not distinctly raised.

The statute of the state of New-York, to which reference
was before made, is as follows:—

"The several clerks of the courts of this state, which by
law have jurisdiction in cases of naturalization, shall, after the
passage of this act, be entitled to demand and receive in natu-
ralization cases, the following fees, and no more: For all ser-
vices upon the first application, the record and certificate thereof
delivered to the alien, the sum of twenty cents: For all ser-
vices upon the completion of the proceedings, including the
record thereof, and a certified copy, to be delivered to any per-
son demanding the same, the sum of fifty cents." (§ 1, *Chap.*
127, *Laws* 1844.)

By the general election laws, (1 *R. S.* 130, § 5,) no court
shall be opened to transact any business on the day of an elec-
tion, unless it be for the purpose of receiving a verdict, or dis-
charging a jury, or the *naturalization* of foreigners.

This clause was stricken out of the act by the statute of
1847, (*Ch.* 240,) for the obvious reason, that by another sec-

tion, the voter was to have been a citizen for ten days previous to the election. (*Id.* § 17.)

By the 14th section of the general act, upon a challenge, the inspectors are to ascertain, whether the party is a native or a naturalized citizen; and if the latter, when, where, and in what court, or before what officer, he was naturalized.

There was, also, an act passed in 1844, relating to the justices' courts in the city of Troy, prohibiting them from granting certificates of naturalization on the day on which any charter or general election should be held within such city. (*Laws* 1844, *Chap.* 198.)

Although, upon the rule I consider to exist, these statutes cannot be considered as conferring a power to naturalize, which I hold the state legislatures are incompetent, even by the most explicit words, to bestow : yet they are by no means without an influence upon the question. I think they operate in this manner :—

The power of legislation upon this subject existed in the states prior to the constitution. The legislation would have been executed in the ordinary tribunals of justice. The power has been superseded by an act of congress passed under the constitution. Congress adopt the state tribunals as the agents to exercise the power, as they would have performed it before. The concurrence of the state legislatures, expressed or fairly implied, adds the sanction of the state to this delegation of power. Whether such tribunals are bound to act may admit of controversy. That their acts are lawful, if they do so, seems undeniable.

There is no decision of any court, unless it be that of California, negativing this proposition. I have examined the following cases with care :—*Martin* agt. *Hunter's Lessees,* 1 *Wheat.* 304; *United States* agt. *Lathrop,* 17 *John. Rep.* 261; *State* agt. *M'Bride,* 1 *Rice's Rep.* 400; *The State* agt. *Randall,* 2 *Aiken's Rep.* 80; *Mattison* agt. *The State,* 3 *Missouri Rep.* 421; *United States* agt. *Campbell,* 6 *Hall's Law Jour.* 113; *The State* agt. *Feely, Virginia Cases,* 321; *Hancy* agt. *Shap,* 1 *Dana,* 442; *Ex parte Pool, Serg. Const. Law,* 272.

There is no little authority to sustain it. It has been prac-
ticed in most of the states of the Union, since the passage of
the act, by the most learned and eminent judges, without a
doubt of their power.

It has been sanctioned, if not by the strong implication from
positive statutes of the states, yet from their abstaining from
adopting any regulation upon the subject for this long series of
years. The history of the subject in our own state is in-
structive.

In the opinion in *Lynch* agt. *Clark*, before referred to, the
assistant vice-chancellor noticed numerous colonial acts of dif-
ferent colonies upon this subject. One was passed in New-
York in 1683; another in July, 1715 : and by the constitution
of 1777 it was declared to be in the discretion of the legisla-
ture to naturalize all such persons, and in such manner, as they
shall think proper. (*Art.* 12.)

This clause does not appear in any subsequent revision of
the constitution. The regulation of the whole subject, in sub-
stance and detail, has been left to congress.

In the case of *Wm. Gladhill*, (8 *Met. Rep.* 168,) the question
was as to the right of the police court of *Lowell* to receive the
declaration of intention. The court say, " As the authority
which any state court can have on this subject is derived from
the law of the United States, congress alone can prescribe a
uniform rule of naturalization." They proceed to examine the
law of 1802, and decide that the police court was a court of
record within its meaning. (*See, also, Towle's case,* 1 *Leigh's
Rep.* 773.)

In *Prigg* agt. *The Commonwealth of Pennsylvania,* (16 *Peters,*
540,) it was held, that a claim to a fugitive slave was a contro-
versy arising under the constitution, and under the express
delegation of federal power given by it. That the act of con-
gress of 12th Feb. 1793, excluded the exercise of any legisla-
tion by the states upon the subject. And as to the power con-
ferred upon state officers, Justice STORY says, delivering the
opinion of the court, " We hold the act to be clearly constitu-
tional in all its leading provisions; and, indeed, with the excep-

tion of that part which confers authority upon state magistrates, to be free from reasonable doubt. As to the authority so conferred on state magistrates, while a difference of opinion has existed, and may exist still on the point in different states, whether state magistrates are bound to act under it, none is entertained by this court, that such magistrates may, if they choose, exercise that authority, unless prohibited by the state legislature." Chief Justice TANEY states, upon this point, the same doctrine.

Justice M'LEAN takes stronger ground, and considers the state magistrates bound to enforce the act.

It appears to me, that there cannot be a reasonable doubt as to the validity of the act of naturalization performed by a state court, when it is not expressly prohibited.